Richard M. ARONOFF,
et al., Appellants,

v.

The LENKIN COMPANY & Lerner
Enterprises Limited Partnership,
Appellees.

Richard M. ARONOFF,
et al., Appellants,

v.

COMMONWEALTH LAND TITLE
INSURANCE CO., Appellee.

Nos. 91–CV–78, 90–CV–1425, 90–CV–1426,
90–CV–1427, 90–CV–1428, 90–CV–1429,
90–CV–1532 and 91–CV–77.

District of Columbia Court of Appeals.

Argued June 18, 1992.
Decided Dec. 30, 1992.

**670**

Burton A. Schwalb, with whom Ellen Kabcenell Wayne, Washington, DC, was on the brief, for appellants.

Mark D. Hopson, with whom Thomas C. Green, Washington, DC, was on the brief, for appellees The Lenkin Co. and Lerner Enterprises Ltd., Partnership.

James M. Saunders, with whom John G. McJunkin, Alexandria, VA, was on the brief, for appellee Commonwealth Land Title Ins. Co.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

After a bench trial, the Superior Court upheld cancellation of a contract for the purchase and sale of a District of Columbia limited partnership and ordered that a one million dollar deposit (originally in the form of a letter of credit) be returned to the purchasers. The trial judge ruled that by failing to tender insurable title to the limited partnership's realty, the sellers had not complied with an express condition precedent both to the purchasers' duty to perform at closing and to the sellers' own right to declare the deposit forfeit; therefore, they had no legal authority to draw down the letter of credit. In No. 91–CV–78, the sellers (appellants here) contend on alternative grounds that the court erred because title was insurable before they presented the letter of credit for payment, and hence the condition precedent was satisfied; and that, if the condition was not satisfied, it was excused because the purchasers' conduct contributed materially to the failure to tender insurable title. We reject the sellers' insurability argument in its broad form, but hold that the trial judge did not address adequately a provision of the contract permitting the sellers, at closing, to arrange for fulfillment of any unsatisfied condition—such as insurable title—to the *"reasonable* satisfaction" (emphasis added) of the purchasers. We also conclude that the judge must consider further whether the purchasers prevented the performance of the condition precedent. We therefore remand the case to the trial judge for additional consideration of these issues.

In Nos. 90–CV–1425 *et al.,* the sellers appeal from the dismissal under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure of their separate suit against the designated title insurer, commonwealth Land Title Insurance Company, for negligence, breach of contract, and breach of fiduciary duty. Because we conclude that, as to the latter count, the sellers have

stated a claim upon which relief can be granted, we reverse the dismissal in part and affirm in part.

## I.

### A.

In 1987, the sellers were the general partners of three partnerships doing business in the District of Columbia: ACO 14th & F Limited Partnership (ACO), Bender/14th Street Associates Limited Partnership (Bender), and Mason 14th & F Limited Partnership (Mason). These partnerships owned all of the general and limited partnership interests in a fourth entity, 607 14th Street Associates Limited Partnership (607 Partnership), which in turn owned a parcel of real property in the District of Columbia. Another entity, Lenkin Company (Lenkin), wanted to acquire this real estate. Negotiations followed and on September 15, 1987, the sellers entered into a written contract on behalf of ACO, Mason, and Bender to sell Lenkin all of the partnership interests in 607 Partnership for twenty-two million dollars.[1] The agreement noted expressly that time was of the essence and set the closing for November 2. At some point before November 2, Lenkin assigned half of its interest in the contract to the Lerner Enterprises Limited Partnership (Lerner).

In keeping with the contract, the purchasers deposited a one million dollar irrevocable letter of credit with the Commonwealth Land Title Insurance Company, and when a "feasibility period" allowing the purchasers to withdraw from the deal without liability expired, Commonwealth delivered the letter of credit to the sellers. Thereafter, the deposit was subject to for-

feiture under specific circumstances. Section 10(a) of the agreement provided:

> If Sellers shall have fully performed their obligations hereunder and the Purchaser shall fail to close in accordance with the terms hereof, except for the failure of a condition precedent set forth herein, the Sellers shall be entitled to draw down the Letter of Credit and retain the proceeds received therefrom as liquidated damages (and as Sellers' sole remedy hereunder), and the Purchaser shall be released and discharged from any and all further liability or obligation hereunder.[2]

The purchasers' duty to close was conditioned by section 9 of the contract, which provided in part:

> The following conditions shall exist at the time of Closing hereunder, and the obligation of the Purchaser to purchase the Partnership Interests pursuant to this Agreement shall be expressly conditioned upon and subject to the satisfaction (or written waiver by the Purchaser) of each such condition:
>
> (a) ... the conditions concerning title to the Property contained in Section 5 shall have been fully satisfied.

In turn, section 5 required that

> [f]ee simple title in and to the Property shall be marketable, *insurable* (current revision) *by the Title Company* and free and clear of all liens, encumbrances, leases, agreements, easements, covenants, conditions and restrictions, except for those matters shown on *Exhibit C* attached hereto and made part hereof (the "Permitted Exceptions"). [Emphasis added.]

The terms of the agreement defined "the Title Company" as Commonwealth Land Title Insurance Company.[3] Thus the con-

---

1. The parties designed the transaction to effect a transfer of the real property to Lenkin while leaving its record ownership intact.

2. We have held that a contract provision such as this normally creates an option contract. *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1096 (D.C. 1988). But the case was tried and decided on the theory that the agreement was one for purchase and sale, and we treat it on that basis.

3. The parties agree they intended Commonwealth to act as both settlement agent and title insurer. Commonwealth had underwritten the most recent policy insuring 607 Partnership's title to the subject property effective November 26, 1986; but that policy did not insure against defects in title attaching after the effective date. We were informed at oral argument that the parenthetical phrase "(current revision)," quoted above, refers to the new policy Commonwealth was expected to issue in regard to this

tract made both the sellers' right to draw down the letter of credit and the purchasers' duty to tender the purchase price at closing contingent on whether title to 607 Partnership's real estate was insurable by Commonwealth.

In the event of a failure of condition, section 9 gave the purchasers the right, at their option, to terminate the agreement and obtain return of the letter of credit. The right, however, was limited by two other provisions. One (in section 9) gave the sellers "the right ... to satisfy at Closing, to the reasonable satisfaction of Purchaser, any unsatisfied condition." The other (in section 5) required the purchasers to order a title report and notify the sellers of "variances" between the contract's schedule of permitted exceptions and the state of title at closing; it also gave the sellers the right to postpone settlement for up to two weeks in order to cure such a defect.[4]

The purchasers, however, never ordered an update of title from Commonwealth and did not notify the sellers before settlement of variances or any other objections raised on November 2. They also cancelled a "pre-closing" scheduled for October 29, and did not supply the sellers with an updated closing checklist despite the sellers' request.[5] At the request of the purchasers, the settlement was scheduled for 3:00 p.m. on November 2 (thereby making bank transfers of funds and recording of documents impractical that day), and the parties convened as scheduled. The principal representative of the sellers was Richard Aronoff, the general partner of ACO. The purchasers were represented by their attorney, Jerald Pasternak, and another member of his firm, Alan Weitz. Also in attendance was Charles Duke, an officer and representative of Commonwealth. The sellers began the meeting by tendering the closing documents specifically listed in the contract and all documents previously requested by the purchasers. Almost immediately, the purchasers' representatives objected to various aspects of the tender and demanded for the first time additional documentation, including proof that the certificates of limited partnership for ACO and Mason were recorded.[6] Aronoff, anticipating this objection, had sent the ACO and Mason certificates to a commercial recording service that morning, and he informed the purchasers that proper recording in the District would take place either that day or

transaction. On October 16, 1987, Commonwealth issued a binder provisionally committing itself to insure in the amount of twenty-two million dollars.

4. Before executing the contract, the purchasers ordered a preliminary report of title from Commonwealth. For that report, Commonwealth searched 607 Partnership's title up to September 11, 1987. Section 5 required the purchasers to order a new title report for the period between September 11 and closing and to notify the sellers of variances discovered therein.

5. The purchasers had furnished the sellers with a closing checklist on September 30, 1987. An updated checklist as well as a "trial" closing presumably would have apprised the sellers of any additional documents the purchasers required, or of any additional matters they wanted resolved.

6. Pasternak admitted at trial that he had not previously requested the documents that were not produced at the closing, testifying that he expected the sellers to produce them as a matter of course. Both the absence of a prior request and the expectation are surprising since it was undisputed that before executing the contract, the parties had discussed the fact that at least one of the sellers (ACO) had not recorded its certificate of limited partnership and agreed to alter a particular contractual representation so that, at the signing *and at closing*, each seller warranted that it was merely "a partnership duly formed ... under the laws of the District of Columbia," rather than a limited partnership. The parties made this change so the sellers could avoid misrepresenting their legal status, because under District law, a limited partnership is not duly constituted unless its certificate is recorded. *See* D.C.Code §§ 41–201, –202(a)(2) (1986) (repealed December 10, 1987); § 41–421(b) (1990).

Although, as the trial judge found, these discussions did not pertain to the condition precedent that the sellers deliver insurable title, the purchasers surely were on notice from the inception of the agreement that one, if not two, of the selling entities was not legally constituted as a limited partnership; and there was no evidence that before November 2 they apprised the sellers that a failure to record would impede settlement or attempted to bring this matter to Commonwealth's attention.

the next.[7]

More objections followed, and the atmosphere became rancorous. Other than the initial deposit, the purchasers had not delivered any of the purchase money to Commonwealth, and they refused to apprise the sellers whether alternative arrangements for payment had been made. Nor would they say whether they intended ultimately to close the deal or whether, in their view, any particular matter to which they had objected was a material default in the sellers' performance or a failure of condition. Their representatives stated only that they would not settle at that time, but instead would discuss their concerns with their clients and advise the sellers of their position the next day. Although neither party formally declared the other in default, at 8:45 p.m. the sellers tendered all of their conveyancing documents to Duke with a letter instructing him to retain them in escrow until 9:30 a.m. November 3, and to return them if the purchasers had not delivered sufficient funds by then to complete the settlement.[8] During the entire meeting, neither the sellers nor the purchasers had asked Duke if Commonwealth was satisfied with the tendered documentation and ready to commit to issue a title insurance policy in connection with the sale.

As it turned out, Commonwealth was not prepared to issue a new insurance policy on November 2. Duke believed a failure to transfer all of ACO's and Mason's interests in 607 Partnership could result in a cloud on the purchasers' title to the underlying real estate, and possibly subject Commonwealth to liability. Hence, he required evidence that the ACO and Mason certificates had been recorded properly, since that evidence would confirm that the conveyancing documents accurately described the sellers as District of Columbia limited partnerships and identify to a legal certainty all ACO and Mason partners, general and limited. He did not articulate these concerns to the parties at the time, however, because amid all the disputes, no one asked him to review the documents to see if they were adequate for issuance of a title insurance policy.[9]

The next morning Aronoff spoke with Michael Sanders, a senior attorney for the purchasers, and scheduled a meeting with him for 2:00 p.m. that day. Later that morning, at 11:00 a.m., Duke appeared personally at Aronoff's office and returned the documents tendered by the sellers the previous evening. At Aronoff's request, Duke confirmed in writing that the purchasers

7. The purchasers also demanded for the first time a corporate resolution and a certified copy of the by-laws and articles of incorporation of one of the limited partners of ACO. The trial judge found that Duke was not prepared to insure 607 Partnership's title on November 2 without these documents. However, the court also found that Duke confirmed on November 4 that he was willing to issue a new insurance policy at that time—*i.e.*, before he received the corporate documents—and Duke reaffirmed as much at trial. Therefore, we follow the trial court's lead and focus our analysis on the significance of the failure to produce evidence that the ACO and Mason limited partnership certificates were recorded. We note, however, that even if the absence of the corporate documents were material, it would not change the disposition of this case. It is undisputed that these documents had not been requested previously, and that Aronoff offered at the closing to assemble the directors of the corporate partner and prepare a resolution. Further, the purchasers' own evidence (Aronoff's contemporaneous notes) appears to confirm that the sellers promised to deliver the other documents after the settlement was completed.

8. The testimony is conflicting on whether the sellers informed the purchasers' representatives of the ultimatum and the 9:30 a.m. deadline contained in the letter of instruction. Aronoff and another seller both testified that the contents of the letter were made known to the purchasers' counsel. But Pasternak could not recall having seen the letter on November 2, and Weitz testified that "the instruction letter ... was not shown to us or made known to us." Both further denied knowing or hearing on November 2 that the sellers' tender would be withdrawn at 9:30 a.m. on November 3, and Duke's testimony appears to confirm that the deadline may not have been communicated. Pasternak and Weitz admitted, however, that they were aware of the tender of the conveyancing documents to Duke.

9. Duke appears to have decided that he needed this evidence when the purchasers raised the recordation issue for the first time at the November 2 closing.

had not communicated with him and had not delivered any funds to Commonwealth. At 11:45 a.m., the sellers presented the one million dollar letter of credit to Riggs National Bank demanding payment. The bank promptly notified the purchasers of the demand.

On learning the sellers had presented the letter of credit for payment, the purchasers' counsel cancelled the 2:00 p.m. meeting and attempted to telephone Duke. When they reached him, he affirmed that he had not been prepared to underwrite a title insurance policy at the close of the settlement conference. The purchasers' counsel then drafted a letter purporting to terminate the contract and hand-delivered it to the sellers on the afternoon of November 3. The letter advised them that because Commonwealth had not been willing to underwrite title insurance at the closing, an express condition precedent had not been satisfied and the demand upon Riggs National Bank was unwarranted, a demonstration of bad faith justifying termination. The letter also demanded the sellers refrain from drawing down the letter of credit and return it to the purchasers. The sellers did not revoke their demand for payment, and the following day Riggs transferred one million dollars by wire to their account.[10]

After the transfer of funds on November 4, Aronoff spoke with Duke and learned that Commonwealth was specifically requiring evidence that the ACO and Mason certificates were recorded before it would issue a title insurance policy. These certificates had been filed on November 3 as Aronoff had promised at the closing, and he immediately forwarded certified copies of the public record to Duke. On receiving this evidence, Duke confirmed by letter of November 4 that "the documentation [he] needed under the Commitment to proceed with recordation and issuance of policy" was complete. The sellers then hand-delivered a letter to the purchasers denying any failure of performance on their part, and declaring that the purchasers themselves had defaulted when, without justification, they refused to close on November 2. The sellers still offered to complete the transaction on the terms stipulated in the contract and to credit the purchasers with the one million dollar deposit plus interest. The purchasers declined this proposal, and brought the present suit to recover their deposit.

### B.

The trial judge found the contract to be completely integrated and unambiguous, and that section 10(a) of the agreement entitled the sellers to claim the deposit "only *after* Sellers' satisfaction of all conditions precedent" (emphasis in original) and a subsequent failure of the purchasers to perform. Because "the decision to issue title insurance [was] a discretionary one which the parties committed to a particular underwriter," the judge ruled that "the contract expressly placed the decision as to 'insurability' in the hands of Commonwealth." Thus, sections 5 and 9 of the agreement required the sellers to "produce at closing a title that was 'insurable' by Commonwealth ... [as] an express[ ] condition precedent to Purchasers' obligation to perform and ... to the Sellers' right to draw down the letter of credit as liquidated damages." But since Commonwealth was not prepared at the November 2 closing to commit irrevocably to issue a new title insurance policy and the sellers presented the letter of credit for payment before such a commitment was made, the judge found that the sellers had materially breached the contract by seizing the deposit before they had a right to do so. He also ruled that the "cure" provisions of sections 5 and 9 did not apply "to the failure to produce documentation necessary to satisfy the 'insurable' title provision of section 5," and that, in any event, the sellers had no contractual "right to cure the failure of a condition precedent *after* drawing down the letter of credit" (emphasis in original). Accordingly, he entered judgment jointly and severally against the sellers in the amount of one million dollars, plus pre-judgment interest from the date of the seizure of the purchasers' deposit.

---

**10.** Lenkin and Lerner later reimbursed Riggs National Bank $500,000 each.

## II.

Neither the sellers nor the purchasers contend that the contract is ambiguous, or that it is not a final and complete integration; and they agree that, subject to the permitted exceptions, it required the sellers as an express condition precedent to bring to closing a real estate title "insurable" by Commonwealth. The first question on which they differ is whether the sellers actually tendered "insurable" title within the meaning of the agreement, and hence performed the condition precedent according to its terms. The sellers contend broadly that they tendered insurable title and that Duke's unwillingness to issue a policy on behalf of Commonwealth on the day of closing was objectively unreasonable. More narrowly, they argue that even if *Commonwealth's* unwillingness to insure on that date was justified, the trial judge concluded erroneously that the purchasers had no duty under section 9 of the contract to accept "reasonable" arrangements for satisfying the unmet condition, and thus did not address adequately whether *appellees'* unwillingness to settle at the agreed-upon time was warranted. We reject the first argument but find merit in the second.

### A.

■ The sellers argue that because Commonwealth had no reasonable grounds on which to refuse to issue a policy on November 2, the condition precedent requiring insurable title was satisfied. Seizing on the distinction between the realty owned by 607 Partnership and the various partnership interests themselves, the sellers assert that when Duke demanded proof not just that fee simple title to the property was vested in 607 Partnership,[11] but also that the purchasers "were getting the personalty," *i.e.,* the interests of all existing partners, he "held the title insurance hostage to a document demand that did not bear on the title to the realty." The trial judge ruled that this agreement committed the decision whether to insure or not to Com-

monwealth's professional judgment, not subject to review for correctness or objective reasonableness by the court.[7] As this is an issue of contract interpretation, we review that ruling *de novo. Christacos v. Blackie's House of Beef,* 583 A.2d 191, 194-95 n. 3 (D.C.1990). We agree with the trial judge.

■ Contracts conditioning one party's duty of performance on the satisfaction of a third party are not uncommon. *See* 3A A. CORBIN, CORBIN ON CONTRACTS §§ 649-52 (1960); 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 675 A, 794-98 (3d ed. 1961). It is settled law in conveyancing that parties may commit insurability of a real estate title to the judgment of a designated title insurer and condition the buyer's obligation on the seller's tender of a title meeting the insurer's approval. 77 AM.JUR.2D *Vendor and Purchaser* § 130 (1975); 92 C.J.S. *Vendor & Purchaser* § 185b (1955); Annotation, *Marketable Title,* 57 A.L.R. 1253, 1322-24 (1928). When parties have agreed that a seller will give title such as a designated title company will approve and insure, the seller's willingness (and ability otherwise) to deliver a marketable title is irrelevant if, at the time appointed, the insurer refuses to approve or insure the title without exception other than as provided in the contract. *Kopp v. Barnes,* 10 A.D.2d 532, 204 N.Y.S.2d 860, 863-64 (1960); *Beinhauer v. Morris,* 142 A.D. 398, 126 N.Y.S. 511, 512 (1911); *Allen v. McKeon,* 127 A.D. 277, 111 N.Y.S. 328, 329 (1908). Unless there has been fraud, gross mistake of fact, or some other evidence of its failure to use honest judgment, the designated insurer's good faith decision is conclusive on the parties that have agreed to submit to its judgment. *Pacific Tel. & Tel. Co. v. Davenport Indep. Tel. Co.,* 236 F. 877, 881 (9th Cir.1916); *Brinn v. Mennen,* 4 N.J. 610, 73 A.2d 541, 544-45 (1950); *Creative Living, Inc. v. Steinhauser,* 78 Misc.2d 29, 355 N.Y.S.2d 897, 900 (Sup.Ct.1974), *aff'd,* 47 A.D.2d 598, 365 N.Y.S.2d 987 (1975). *See* RESTATEMENT (SECOND) OF CONTRACTS § 227 comment c &

---

**11.** The sellers point to Duke's uncontradicted admission that on November 2, 1987, Common-

wealth could have issued a policy insuring that fee simple title was vested in 607 Partnership.

illustrations 5–8, § 228 comment b (1981); *see generally United States Trust Co. v. Incorporated Town of Guthrie Center,* 181 Iowa 992, 165 N.W. 188 (1917) (surveying case law applying good faith standard to contracts conditioned on third party satisfaction).

▮ The sellers here distinguish these authorities on the ground that generally they involve contracts that appear expressly to commit insurability to the named insurer's unilateral decision. The contract in this case, the sellers point out, did not require them to deliver a title such as a designated title company "will approve and insure," *e.g., Newmark v. Weingrad,* 43 A.D.2d 983, 352 N.Y.S.2d 660, 662 (App. Div.), *aff'd,* 35 N.Y.2d 832, 362 N.Y.S.2d 863, 321 N.E.2d 784 (1974), but rather a title that was "insurable" by Commonwealth, *i.e.,* one "capable of being insured." [12] We reject this distinction and hold that the contract obligated the sellers to deliver a title which the designated title company, in the honest exercise of its professional judgment, would in fact insure.

In *Mackenzie v. McLean,* 20 N.J.Super. 517, 90 A.2d 515 (App.Div.1952), the sellers agreed to deliver "a marketable title and one that will be insurable by a recognized title company." *Id.* at 516. The buyer refused to perform the agreement to purchase a licensed tavern because her title company had declined to insure the title without excepting from coverage a restrictive covenant enjoining use of the property for the sale of intoxicating liquors. *Id.* The sellers sought to remove the ground for objection by retaining "another recognized title company, but it would only insure against actual loss by virtue of the restriction[ ] being violated; it would not insure the title outright without reference to the restriction[ ]." *Id.* The sellers also contended that the restriction was unenforceable. *Id.* at 517. Affirming a judg-

ment for the buyer, the appellate court read the contract to mean that the sellers "bound themselves to furnish more than a merely marketable title," *id.;* the buyer had also bargained " 'for a title which the local [title] company *would* insure, so that [s]he could turn over the policy to a mortgagee or a purchaser.' " *Id.* at 516 (emphasis added) (quoting *Love v. Fetters,* 98 N.J.L. 784, 121 A. 607, 607 (1923)). Whether or not the title was marketable, the issue was "whether a recognized title company would insure the title...." *Id.* at 517. *See also Conklin v. Davi,* 76 N.J. 468, 388 A.2d 598, 601–02 (1978) (condition precedent requiring sellers to convey a title "insurable ... by any reputable title insurance company" licensed in New Jersey had probably been fulfilled since an officer of a reputable New Jersey title company had "testified to a willingness to insure").

As in these cases, the parties to this contract did not bargain for insurable title in the abstract; they agreed to a title insurable *by Commonwealth,* and in so doing— as a matter of law—they made Commonwealth's good faith judgment dispositive. *See Pacific Tel. & Tel. Co.,* 236 F. at 881; RESTATEMENT (SECOND) OF CONTRACTS § 227 comment c & illustration 5 (1981). As we find no basis in the record on which to impugn Commonwealth's good faith unwillingness to insure without prior recordation of the limited partnership certificates, its refusal may not be second-guessed. *Brinn v. Mennen,* 73 A.2d at 545; *Kopp v. Barnes,* 204 N.Y.S.2d at 863–64.[13]

### B.

▮ Holding that Commonwealth's judgment may not be reviewed for objective reasonableness, however, does not resolve the issue of whether *the purchasers* could regard the condition precedent of insurable title as unsatisfied and refuse to settle on November 2. The contract specified that

---

**12.** *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (Philip B. Gove ed., 16th ed., G. & C. Merriam Co. 1971) ("insurable").

**13.** As the trial judge pointed out, requiring proof of recordation "would, among other

things, confirm for Commonwealth the existence and identity of all of the general and limited partners of ACO and Mason and thereby insure that Purchasers were acquiring all of the interests in 607 owned by ACO and Mason."

closing would occur on November 2 "provided all conditions precedent thereto have been satisfied or waived." As if to underscore the importance of the November 2 date, section 9 ("Conditions Precedent to Closing") concluded with the following language:

> Notwithstanding anything to the contrary in this Agreement, Sellers shall have the right (but not the obligation) to satisfy at Closing, to the *reasonable satisfaction* of Purchaser, any unsatisfied condition hereunder; if Sellers elect to do so, and if Purchaser is reasonably satisfied by such arrangements, Closing shall take place as provided herein. [Emphasis added.]

The sellers argue that this provision manifests the parties' intent to override the usual rule of law that an express condition precedent must be fulfilled exactly, and substitutes instead a right of the sellers to offer alternative arrangements upon consent of the purchasers that could not be *unreasonably* withheld. We agree with this interpretation, and conclude that the trial judge did not consider adequately the effect of this provision on the parties' rights and obligations.

■ Unlike conditions of third person satisfaction where that person's judgment is generally insulated from objective review, see part II.A., *supra*, performance of a condition requiring satisfaction of a party may be tested for reasonableness if there is no contrary contractual intent and it is not otherwise impracticable for a court to do so. RESTATEMENT (SECOND) OF CONTRACTS § 228 (1981); 92 C.J.S. *Vendor & Purchaser* § 185a (1955). *See also* 3A A. CORBIN, *supra* §§ 644–47; 5 S. WILLISTON, *supra* § 675B; *see generally Dillinger v. Ogden*, 244 Pa. 20, 90 A. 446 (1914) (surveying cases). But beyond these general standards of contract interpretation, the parties

here, in unmistakable language, agreed that the sellers' failure to perform any contractual condition would not be grounds for default if they performed the condition at closing to the purchasers' reasonable satisfaction. This plainly meant that, despite a failure of literal compliance, minor and readily curable defects affecting conditions such as insurability of title would not prevent purchasers' performance from becoming due if they reasonably should have accepted the sellers' "arrangements" at closing to cure the defects. Thus a key question is: should Aronoff's assurances that recording of the ACO and Mason certificates would take place at the latest on November 3 reasonably have satisfied the purchasers that 607 Partnership's title was insurable within the meaning of the contract. If the answer is yes, then insurability presented no bar to a prompt closing. If no, the condition precedent was not fulfilled.[14]

The trial judge adverted to section 9's reasonable satisfaction provision but ruled, without explanation, that it was "[in]applicable to the failure to produce documentation necessary to satisfy the 'insurable' title provision of section 5 of the contract." This was error. By its terms the reasonable satisfaction clause (part of a section dealing with "Conditions Precedent to Closing") applies to "*any* unsatisfied condition hereunder" (emphasis added) and "[n]otwithstanding anything to the contrary in this Agreement." Any legal difference between failing to produce insurable title and failing to provide documents necessary to establish a title's insurability is illusory. The judge further ruled that section 9 "does not provide Sellers with the right to 'cure' the failure of a condition precedent *after* drawing down the letter of credit" (emphasis in original). But this focuses on the wrong event, which was not what oc-

---

**14.** Owing to Duke's silence, neither party actually knew that the recording problem affected the title's insurability. But just as that fact does not excuse the sellers' duty to perform the condition precedent, neither can it exempt the purchasers from application of the sellers' right to make reasonable arrangements at closing to fulfill an unsatisfied condition. Whether a party knows a condition to his duty has or has not occurred is legally immaterial to the issue of whether "he is privileged not to perform," 3A A. CORBIN, *supra* § 762 at 522. RESTATEMENT (SECOND) OF CONTRACTS § 225 comment e & illustration 9, § 237 comment c (1981). However, the circumstance that the purchasers lodged no objection based on insurability may be taken into account in determining whether the condition was reasonably satisfied.

curred after the aborted closing but the opportunity the sellers were accorded *at settlement* to offer arrangements objectively—"reasonably"—sufficient to satisfy the purchasers that the insurability requirement was met. The purchasers themselves argue in their brief that "[s]ection 9 does not extend to the Sellers any right to 'cure' their failure to satisfy a condition precedent *after* the date for closing has passed" (emphasis in original). Consequently, the trial judge failed to consider whether, in proving the nonoccurrence of the insurability of title condition, the purchasers had shown that their dissatisfaction with Aronoff's arrangements for completing the recordation was reasonable.

The record raises considerable question whether the purchasers can make that showing. They have never claimed there was an actual undisclosed interest in ACO or Mason that had not consented to the transaction,[15] nor that at the time of settlement there were grounds for believing such an interest existed. At the closing Aronoff assured the purchasers that the ACO and Mason certificates had been sent to a commercial recording service that morning and would be recorded by November 3. Given the lateness of the hour and the complexities of the transaction, it is doubtful even the new certificate reflecting the purchasers' acquisition of 607 Partner-

ship could have been recorded until the next day; and the title insurance policy would not have been effective until that certificate was recorded.[16] Hence, the sellers have a substantial argument that in these circumstances, all that stood between the purchasers and title insurance was the simple matter of a legal filing, a formality which the sellers, though surprised with the demand at closing, had already taken steps to accomplish within a time that a reasonable purchaser would have found unobjectionable. Such a purchaser, the sellers contend, would have been satisfied that title was insurable because, as a practical matter, it could not have reasonably doubted that Commonwealth would be prepared to issue a policy in conformity with the contract when it was ready to record the instrument of conveyance.[17]

Whatever the cogency of these arguments, the purchasers respond that they are beside the point. Whether or not the purchasers reasonably spurned Aronoff's assurances of performance on November 2, they argue that the sellers still had no right to draw down the letter of credit on November 3 because the sellers' right to forfeit the deposit could not mature unless all conditions precedent were satisfied *and* the purchasers failed to close as required by the agreement. The latter event did not happen, the purchasers contend, because

---

**15.** If such an interest existed there would have been a breach of contractual warranty that by itself would have been a failure of a condition precedent under the terms of this agreement. Yet the purchasers do not claim that the sellers failed to satisfy the condition that their warranties be true in all material respects.

**16.** Duke's testimony itself suggests that had the parties reached settlement and delivered appropriate instructions, Commonwealth could have recorded the ACO and Mason certificates (or perhaps have ascertained that they were recorded) when it recorded 607 Partnership's new certificate; and uncontradicted testimony indicates that typically the title company would not have disbursed funds until it had done a final title search and recorded the instrument of conveyance. *See Ferguson v. Caspar*, 359 A.2d 17, 21 & n. 9 (D.C.1976).

**17.** The sellers also contend that the purchasers must have been confident the threat of undisclosed, unconsenting interests in the selling enti-

ties was *de minimis* because ACO, Mason, and Bender had furnished the purchasers with the certificates and agreements under which they operated, and had warranted in the contract and other conveyancing documents, among other things, that: (1) they owned 607 Partnership in its entirety; (2) they were assigning all of their interests; (3) the sale would not violate the terms of any agreement to which any of them was a party; (4) the persons executing the agreement had full power and authority to do so; and (5) the "Agreement [did] not, and Closing [t]hereunder [would] not, violate the terms of or require the consent of any party under any other contract or instrument to which any Seller [was] a party or successor party." The sellers and each of their general partners also agreed in the contract to defend and indemnify the purchasers against any claims or losses (including reasonable attorney's fees) arising out of any breach of warranty or representation in any document delivered by the sellers, or as a result of any liability accruing prior to the closing not expressly assumed by the purchasers.

the parties agreed on November 2 to resume the settlement the following day. Hence, the sellers materially breached the contract by pocketing the deposit before closing could be completed, thereby justifying the purchasers' decision to terminate.

If the parties indeed had consented on November 2 to extend the closing so Pasternak could consult with his clients the next day, then seizure of the deposit would have been unwarranted, breaching both the contract and the sellers' implied duty of good faith and fair dealing. *See Hais v. Smith,* 547 A.2d 986, 987–88 (D.C.1988); RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). But the record contains no evidence that the parties *mutually* agreed to extend the time for performance or that the sellers waived their contractual right to draw down the letter of credit if all conditions precedent were satisfied and the purchasers still failed to perform at the appointed time.[18]

The agreement by its terms stipulated that closing would take place on November 2. It also expressly made time of the essence. *See Siegel v. Banker,* 486 A.2d 1163, 1165 (D.C.1984); *Landow v. Georgetown–Inland West Corp.,* 454 A.2d 310, 313 (D.C.1982). Thus without contractual authority or a new agreement, neither party could extend the time for its own performance unilaterally and bind the other. The purchasers had no contractual right to delay their performance other than for a failure of condition. Hence, if the insurable title condition was fulfilled on November 2, their duty to tender the purchase price ripened unless the parties had agreed otherwise. The purchasers contend that the evidence shows there was such an agreement, pointing to the trial judge's finding that "Purchasers' counsel committed to discussing their concerns regarding Sellers' tender with their clients and to advising

Sellers of their position the next day." They argue that in the circumstances the sellers' failure to reject this proposal and declare a default amounted to an acceptance. We disagree.

■ Silence and inaction may operate as an acceptance "[w]here because of previous dealings or [usage of trade], it is reasonable that the offeree should notify the offeror if he does not intend to accept." RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981). And there was evidence that closings in commercial transactions as complex as this sometimes extended over several days (presumably on the basis of mutual agreement). But, to begin with, the purchasers' "offer" to extend was ambiguous at best. In the wake of the various disputes, the purchasers' representatives merely said they would consult with their clients and "get back to" the sellers. The purchasers did not bargain for anything; they did not say, "If you do these things, we will perform," or "Give us more time and we will fund tomorrow." Instead of such assurances, their position was that they had no duty to perform on November 2; and for all the sellers knew, "getting back to them" could well have meant a notice of termination on November 3.[19]

Moreover, even if the purchasers had made an offer to extend, the evidence is clear that the sellers rejected it. They were not silent or equivocal. The purchasers' own testimony was that "Aronoff obviously took the position that he had whatever he needed," *i.e.,* that he was under no duty to produce additional documents at that time in order to settle. In addition, both Pasternak and Weitz were aware of Aronoff's tender of the conveyancing documents to Duke, and under the contract this tender, if perfect, was the final and necessary predicate to the sellers' right to draw down the letter of credit.[20] The tender of

18. Whether the sellers would have been entitled to terminate the agreement if the purchasers had been in breach on November 2 but subsequently cured is a question not presented by this case. *See* RESTATEMENT (SECOND) OF CONTRACTS § 242 (1981).

19. Indeed, in answer to a question by the trial court, Alan Weitz testified that the purchasers

had only given counsel authority to review the tender, determine if it was adequate, and report back "so the client would then know that it was time to fund the transaction."

20. Section 10(a) of the agreement recites that "Sellers' deposit with the party conducting Closing of all documents required by the terms of

the documents to Duke plainly showed that the sellers were insisting that the purchasers' performance was due; hence reasonable persons in the purchasers' shoes could only have understood that if their performance was not forthcoming, they were assuming the risk the sellers would hold them in default.[21] Since there was no evidence of an objective agreement to extend the time for performance, the parties' rights—as a matter of law[22]—became fixed indelibly at 8:45 p.m. on November 2.[23]

We are thus left with the question whether this court can say as a matter of law that Aronoff's assurances at closing met the "reasonable satisfaction" standard of section 9. As explained earlier, the trial judge did not decide this issue because of his mistaken view that the section did not apply. Although, as we have shown, there is evidence favoring the sellers, we are not in a position to decide the question at the present time. The reasonableness of the purchasers' refusal to accept Aronoff's assurances is at least a mixed question of law and fact, one on which—no matter what the standard of review—we would ultimately accord the trial judge's view substantial deference. As we have stated regarding similar determinations, the trial judge has "the opportunity to observe the trial as it unfolds" and "to weigh and reconcile the evidence" from a standpoint this court cannot replicate. *Davis v. United States*, 564 A.2d 31, 41 (D.C.1989) (en

banc). In these circumstances, we are not prepared to dispense with the judge's findings and analysis on the section 9 issue. A remand for further consideration is even more appropriate given our decision that the trial judge, in the first instance, must still resolve the prevention issue which we discuss next.

### III.

Whether or not the condition precedent was fulfilled in accordance with section 9's reasonable satisfaction provision, a second issue remains which the trial judge must address further. The sellers contend that if they failed to tender insurable title, the condition should be excused because the purchasers' conduct contributed materially to its non-fulfillment. Section 5 of the contract provided that the sellers, upon notice by the purchasers, would have the right to cure variances from the schedule of exceptions listed in the contract. The sellers argue that this right is meaningless if the purchasers could blind themselves to the requirements of Commonwealth (their own prospective insurer) and not notify the sellers that recording of the limited partnership certificates materially affected the quality of title the sellers had agreed to deliver—when, upon timely notice, the sellers easily could have cured the defect. Hence the sellers argue that the purchasers breached their good faith duty to discover Commonwealth's requirements and

---

this Agreement shall be deemed to be good and sufficient tender of performance of the terms hereof." No provision of the contract required the sellers to notify the purchasers before exercising their right to draw down the letter of credit.

**21.** The purchasers do not argue that they accepted Aronoff's offer to extend the time for performance until 9:30 a.m. November 3. Their counsel essentially denied the offer was ever communicated, and even if it had been, by its terms it could only be accepted by funding the escrow account. There was no evidence this was done.

**22.** Since our holding on this issue entails a legal characterization of undisputed facts, there is no need for a remand to the trial court on this point.

**23.** In the trial court the purchasers cited *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d

119 (D.C.1976), *cert. dismissed*, 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977), to sustain the contention that they had not repudiated the contract. Reliance on that case was misplaced. The contract in *AHEPA* was for services and contemplated a continuing relationship between the parties. Under such a contract, and in cases involving prospective non-performance generally, the rule is that "the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Id.* at 125; *see Cooper v. Cooper*, 35 A.2d 921, 924 (D.C.1944). This case is not one involving *prospective* non-performance, but nonperformance on the day performance was due. If the condition precedent was satisfied (or excused), the purchasers' rejection of the sellers' tender without any assurances of future performance was an unequivocal repudiation.

notify the sellers of a defect to which Commonwealth took exception; and that the breach prevented the sellers from tendering insurable title.

The purchasers counter, and the trial judge agreed with them, that the sellers' right under section 5 never arose because the matter to which Commonwealth objected was not a variance; that is, the failure to furnish proof of recording did not relate to a lien or encumbrance "actually found to burden the title." We reject this position, for the purchasers cannot have it both ways. They cannot at once argue that the failure to produce evidence of recording was important enough that Duke could honestly adjudge the title uninsurable, see part II.A., *supra*, yet that this defect did not burden the title sufficiently to implicate the sellers' right to cure. In keeping with the sellers' right to cure variances from the permitted exceptions, the contract required the purchasers to order a title report and notify the sellers of any defects discovered. In our judgment, this duty extended to any matter known to the purchasers for which Duke could have written an exception into the policy, including one based on the sellers' possible lack of authority to convey the 607 Partnership interests.

▆▆▆▆ "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." 5 S. WILLISTON, *supra* § 677 at 224; *accord Horlick v. Wright*, 104 A.2d 825, 827 (D.C. 1954); *Shear v. National Rifle Ass'n of Am.*, 196 U.S.App.D.C. 344, 348, 606 F.2d 1251, 1255 (1979); *see* 3A CORBIN, *supra* § 767 at 540. "Prevention ... can negate a requirement to satisfy a condition precedent," *Shear*, 196 U.S.App.D.C. at 348, 606 F.2d at 1255, and "non-occurrence ... is normally excused when fairly attributable to the promisor's own conduct." *R.A. Weaver & Assocs., Inc. v. Haas & Haynie Corp.*, 213 U.S.App.D.C. 404, 412, 663 F.2d 168, 176 (1980) (citing cases). While active interference of the promisor which "substantially hinders ... occurrence" of a condition will excuse the condition and cause the promisor's performance to become due, *id.; see District–Realty Title Ins. Corp. v. Ensmann*, 247 U.S.App.D.C. 228, 233, 767 F.2d 1018, 1023 (1985); *see also Fateh v. Rich*, 481 A.2d 464, 469 (D.C.1984) (citing RESTATEMENT (SECOND) OF CONTRACTS § 245), a failure to cooperate in performance can also suffice. There is an implied covenant in each contract that the parties will "extend reasonable cooperation" in clearing the way for performance. *Horlick v. Wright*, 104 A.2d at 827;[24] *see Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 576 (D.C.1981); *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d

---

**24.** In *Horlick*, the purchasers' duty to perform a real estate contract was contingent on obtaining financing from the Veterans' Administration or, failing that, from an alternative source identified in the contract. The Veterans' Administration disapproved the purchasers' loan application because the appraised value of the property was less than the purchase price. The purchasers wanted to appeal the decision, and requested a schedule of construction costs from the seller, but he took the position that he had no duty to cooperate in the endeavor and that the purchasers were obligated to proceed to settlement under the alternative financing arrangements. The purchasers refused to close on those terms and the seller declared the deposit forfeit. Holding that the purchasers were entitled to return of their down payment, this court stated: "it must be presumed that the parties intended that the purchasers should be permitted to make reasonable and necessary efforts to secure Veterans' Administration approval," *id.* at 827, and

the contract impliedly "bound [the seller] to extend reasonable cooperation in furnishing information which would help secure a favorable appraisal." *Id.* The seller lawfully could not "place[ ] himself in a position of withholding cooperation in a step vital to the contract." *Id.* And since "his own act of refusing to supply his construction costs [ ] prevented the purchasers from proceeding to perform ..., he [could not] be permitted to claim that they had defaulted." *Id.*

The duty to extend reasonable cooperation is mutual. The *Horlick* purchasers could not have succeeded in avoiding the contract had they expediently failed to notify the seller of their lender's requirements. When a buyer's performance is conditioned on obtaining suitable financing, the buyer has an implied duty to make reasonable efforts to secure such financing, and failure to do so places her in default. *See Butler v. Myers*, 178 A.2d 916 (D.C.1962); *Kelley v. Potomac Dev. Corp.*, 81 A.2d 81 (D.C.1951).

784, 787–88 (D.C.1968); *see also Hais v. Smith*, 547 A.2d at 987–88.

 Under the parties' agreement, the duty to make timely inquiry of Commonwealth about its requirements and notify the sellers in time for closing plainly fell to the purchasers, who were obligated to order and update the title report and notify the sellers of any defects. The sellers argue that the purchasers breached this duty by failing to notify them before closing that Commonwealth required evidence of recording of the partnership certificates before a policy could be issued. Because the trial judge found section 5's cure provision inapplicable, however, he did not squarely address this question. Nor did he resolve the equally pivotal one of whether the purchasers' breach, if any, contributed materially to the failure of the condition precedent, hence making their duty to perform ripen on November 2. *See* RESTATEMENT (SECOND) OF CONTRACTS § 245 comment a (1981).[25] The sellers contend that they had a right to rely on the complete absence of prior objection by the purchasers to the non-recordation—that, in effect, the purchasers lulled them into believing this was a *de minimis* matter that did not affect the validity of their title. *See Aron v. Rialto Realty Co.*, 100 N.J.Eq. 513, 136 A. 339 (Ch.1927), *aff'd*, 102 N.J.Eq. 331, 140 A. 918 (1928); *Hugley v. Caldwell*, 559 S.W.2d 877 (Tex.Civ.App.1977); *see also Day v. Kerley*, 146 A.2d 571 (D.C.1958); *In re Garfinkle*, 672 F.2d 1340, 1347 (11th Cir.1982) ("[s]ilence or acquiescence may be sufficient conduct to create an estoppel if under the circumstances there was both a duty

and an opportunity to speak"). On the other hand, the trial judge found that at least at closing the purchasers "rais[ed] questions ... about the legal capacity of Sellers to convey the bargain[ed] for limited partnership interests." If reasonable persons in the sellers' shoes would have understood this objection to their authority as a substantial challenge to the validity (and hence insurability) of their title, the sellers would be hard put to argue that the purchasers contributed materially to the nonfulfillment of the condition precedent. Then they would have only their own improvidence to blame for seizing the deposit (and so breaching the agreement) before exercising their contractual right to cure.[26]

The trial judge's resolution of this issue is all the more necessary because the evidence on the point (from experienced conveyancers) is conflicting: Pasternak testified that evidence of recording of the partnership certificates is a basic part of this type of transaction; Aronoff testified, in contrast, that he never viewed the purchasers' belated objection as a substantial challenge to the validity of title; and Duke testified that although Commonwealth routinely expects the parties to produce evidence of recording, it has no fixed requirements concerning evidence of legal capacity and it is up to the individual title company officer to determine what evidence, if any, is required. On this record, we cannot say as a matter of law what a reasonable seller in the circumstances, including the parties' course of dealing in regard to this contract, would have understood.[27] We therefore must remand the case for consid-

---

**25.** It is not an answer, as the purchasers contend, that it was always open to the sellers as much as to them to ask Commonwealth what it needed to issue a new policy insuring 607 Partnership's title. For the prevention doctrine to apply, the promisee need not "show that [the condition] would have occurred but for the [promisor's] lack of cooperation," RESTATEMENT (SECOND) OF CONTRACTS § 245 comment b (1981), so long as the non-occurrence is "fairly attributable to the promisor's own conduct." *R.A. Weaver & Assocs.*, 213 U.S.App.D.C. at 412, 663 F.2d at 176. Nor may the purchasers argue that reasonable efforts on their part would not have revealed Commonwealth's requirement. The evidence shows that they had no difficulty dis-

covering the need for recording once they thought it to their advantage to do so.

**26.** Under the contract, the sellers could have elected to correct a variance (and postpone closing) by notifying the purchasers within twenty-four hours of the closing date of their intent to cure.

**27.** *See* 5 S. WILLISTON, *supra*, § 743 at 523 ("[o]n principle, ... it is always a question of fact whether the specification of a single reason [for not performing] operated as a deception, which being relied on prevented the promisee from performing fully as he would otherwise have done.") *See also* 3A A. CORBIN, *supra* § 762.

eration of this issue as well by the trial judge.[28]

## IV.

We turn finally to the dismissal of the sellers' suit against Commonwealth.

In July 1990, two and a half years after Lenkin and Lerner brought suit to recover the one million dollar deposit, the sellers filed a separate action against Commonwealth. The two cases were not consolidated, and on October 15, 1990, the trial court dismissed the sellers' complaint on motion for failure to state a claim upon which relief can be granted. Super.Ct.Civ.R. 12(b)(6). The sellers had alleged five causes of action—negligence, breach of fiduciary duty, estoppel, misrepresentation, and breach of contract—all arising out of the aborted sale of 607 Partnership to Lenkin and Lerner. The trial judge ruled that because Commonwealth was not a party to the purchase and sale agreement, it "owed no contractual duty to [the] parties with regard to this sale" and also "owed no special duties to [the sellers] in its capacity as settlement or escrow agent." We sustain the dismissal as to four of the causes of action, but reverse on the breach of fiduciary duty claim.[29]

■■■■■ The only issue on review of a dismissal made pursuant to Rule 12(b)(6) is the legal sufficiency of the complaint, and to test its adequacy we apply the same standards as the trial court.

In judging the sufficiency of a complaint, we must "construe the complaint in the light most favorable to the plaintiff and assume, for purposes of the motion, that the allegations in the complaint are true." *Vicki Bagley Realty Inc. v. Laufer*, 482 A.2d 359, 364 (D.C.1984). "[A]ny ambiguities or doubts concerning the sufficiency of the claim must be re-solved in favor of the pleader." *Doe v. United States Dep't of Justice*, 243 U.S.App.D.C. 354, 364, 753 F.2d 1092, 1102 (1985). Moreover, a complaint must not be dismissed on grounds that the court doubts that the plaintiff will prevail. *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C.1979).

*Vaughn v. United States*, 579 A.2d 170, 174 (D.C.1990). Thus, a dismissal for failure to state a claim upon which relief can be granted is warranted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Owens v. Tiber Island Condominium Ass'n*, 373 A.2d 890, 893 (D.C.1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *accord, McBryde*, 404 A.2d at 202.

Assuming the allegations in the complaint to be true, and viewing them together with reasonable inferences in the light most favorable to the sellers, the following case is pleaded. In 1987, Commonwealth not only insured real estate titles in the District of Columbia, but also engaged in the business of closing real estate transactions as settlement agent and escrowee [¶ 4]. Having already underwritten the then current policy insuring 607 Partnership's title, Commonwealth agreed to act in all of these capacities in connection with the sale of 607 Partnership to Lenkin and Lerner [¶ 7, 13, 42], contracting with the purchasers to issue a new title insurance policy [¶ 42] and undertaking to close the transaction [¶ 7, 13, 41]. Commonwealth knew that under the terms of the purchase and sale agreement, settlement was conditioned on the insurability of 607 Partnership's title [¶ 8, 14, 23], and unreasonably concluded at the November 2 closing that title was not insurable because of the sell-

---

**28.** The sellers' contention that the trial judge was swayed by the subsequent sale of 607 Partnership is unsupported by the record.

**29.** We are in the position of having to determine the propriety of dismissal of a complaint after having just reviewed a case arising from the same constellation of facts. Nevertheless, at the time the court granted the motion to dismiss, the Lenkin case had not been tried and the sole issue before the judge was the facial sufficiency of the sellers' pleading. Although both parties to this appeal have sought to import and argue "facts" from the companion litigation, we review the judgment that the complaint was inadequate on the basis of the record made in this case, not another. *See* D.C.Code §§ 11–721, 17–305 (1989); *see also* D.C.App.R. 10 (1992).

ers' failure to produce certain documents [¶ 19, 31]. Commonwealth also knew or should have known the sellers could easily produce these documents upon request and were unaware they had failed to satisfy the insurability condition [¶ 34]; yet it deliberately chose not to advise them of the deficiency at any point during the five hour settlement conference [¶ 15, 16, 31, 35, 37], nor when, in performance of its escrow function, it accepted the sellers' tender of documents on November 2 and returned them the following morning [¶ 18; see ¶ 30]. Relying on the fact that the state of title on November 2 was no different than what Commonwealth had insured previously [¶ 9, 16], and on Commonwealth's silence, the sellers believed there was no insurability problem [¶ 16, 22(c), (d), 31, 34, 37]; hence, after the purchasers refused to close (voicing no objection based on insurability of title [¶ 17]), the sellers "retained" the deposit [¶ 12]. Had Commonwealth alerted the sellers to the deficiency in their tender, they would instead have produced the necessary documents thereby precluding the purchasers from subsequently "claim[ing] a right to back out of the contract" [¶ 38, 19, 31].

In short, the underlying theory of recovery is that if the sellers breached the contract of sale, that breach proximately resulted from the breach of duties owed to them by Commonwealth, and depending on whether the sellers are liable to return the purchasers' down payment, Commonwealth's breach will have caused them harm due to the loss of their contractually liquidated damages and the expenses of litigating their rights, or through the litigation expenses alone [¶ 23–25, 44].[30]

■ In cases involving negligent performance of a contract, liability to third parties who suffer only economic loss as a result depends on whether or not the defendant owed a duty of reasonable care to the plaintiff. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444–48 (1931)

(Cardozo, J.). If no duty was owing, the lack of contractual privity normally bars recovery. *Id.; Needham v. Hamilton*, 459 A.2d 1060, 1061–62 (D.C.1983). The sellers here do not seek recovery in contract under their title insurance policy. To the contrary, the complaint alleges that at the time of the proposed sale, 607 Partnership's title was entirely consistent with that policy as well as the purchase and sale agreement. Nor does the complaint allege that the sellers contracted with Commonwealth as a title insurer on the occasion of this transaction. Yet, the sellers contend that despite the lack of privity on the purchasers' contract, a cumulative and overarching duty of reasonable care arose out of Commonwealth's multi-faceted relationship with the parties. They assert that as the current and prospective insurer of 607 Partnership's title as well as the settlement agent and escrowee for the contemplated sale, Commonwealth may be held to answer for negligently concluding at closing that the sellers' title was uninsurable and for failing to notify them of the alleged defect.

■ We reject this analysis. The duties arising out of the two insurance contracts are severable from those arising from the undertaking to perform conveyancing duties. *Hooper v. Commonwealth Land Title Ins. Co.*, 285 Pa.Super. 265, 427 A.2d 215, 216 (1981); *Henkels v. Philadelphia Title Ins. Co.*, 177 Pa.Super. 110, 110 A.2d 878, 880 (1955); *see Logan v. Gans*, 277 Pa.Super. 282, 419 A.2d 772, 775 (1980). A title insurer, when it acts exclusively as an insurer, is liable only to its insured and not to third parties. *Hooper*, 427 A.2d at 217. As we explain in the following, there is no basis in the complaint for holding Commonwealth liable as a title insurer, and since the sellers' claims of negligence, estoppel, and misrepresentation arise solely in relation to breaches of duties allegedly owed in that capacity, dismissal of those claims was proper.[31]

---

30. As to the latter, *see Taylor v. Tellez*, 610 A.2d 252, 255–56 (D.C.1992) (claim for attorney's fees arising from wrongful involvement in litigation).

31. To the extent the complaint alleges Commonwealth negligently performed its settlement and escrow functions, we view those allegations as redundant of the breach of fiduciary duty claim.

The sellers contend that Commonwealth, as the prospective insurer for the purchasers, owed the sellers a duty not to decide unreasonably that their title was uninsurable. This contention is untenable on its face. It amounts to saying that Commonwealth was too prudent when it decided the sellers had to produce additional documentation, and that it owed the sellers some duty to insure without those documents. We think a title insurer has an unqualified right to select the risks it is willing to underwrite. *Gilchrest House, Inc. v. Guaranteed Title & Mortgage Co.,* 277 A.D. 788, 97 N.Y.S.2d 226, 228 (1950), *aff'd,* 302 N.Y. 852, 100 N.E.2d 46 (1951). Unless it is otherwise bound by law or contract, it may refuse to insure for any reason, sound or not, or for no reason at all. On the facts alleged, Commonwealth, as an insurer of real estate titles, owed no duty to the sellers to insure their title on November 2, 1987, even if it was consistent with the state of title insured previously and the state of title it had contracted with the purchasers to insure.

Nor did Commonwealth's failure to advise the sellers of its requirements breach any duty it owed them either as their insurer or as the purchasers' insurer. That omission would be actionable negligence only if there was a duty to speak. The complaint does not allege that the sellers' insurance policy entitled them to notice of what Commonwealth would require in regard to future policies; and the sellers' contention that they were third party beneficiaries of the contract to insure the purchasers' title is unpersuasive. The objective of a contract to issue title insurance is the issuance of a policy to protect the insured from loss due to defects in the title it acquires. *Hooper,* 427 A.2d at 217. The intent is not to benefit the seller of real estate, but the buyer. *See id.; Logan v.*

*Gans,* 419 A.2d at 774. Any benefit accruing to the seller in the form of enhanced marketability of title is merely an incident of the insurance contract, not one directly intended by the parties. *See Bay General Indus. Inc. v. Johnson,* 418 A.2d 1050, 1055 (D.C.1980) (third party may sue on contract "if the contracting parties intend the third party to benefit directly thereunder"); *Greenbaum v. Smith,* 409 A.2d 621, 623 n. 5 (D.C.1979) (same). The complaint alleges no facts that would sustain the conclusion that Commonwealth intended the sellers to benefit from its insurability determination in connection with this sale,[32] or that it assumed a duty as the sellers' insurer to advise the sellers of its requirements for the issuance of a new policy. The negligence cause of action was properly dismissed.[33]

The sellers further alleged that, by having insured the same state of title before and choosing to remain silent at the closing, Commonwealth effectively misrepresented its position and was estopped to deny insurability when it later advised the purchasers of the conclusion it had reached on November 2. We disagree. Commonwealth's previously issued policy of insurance and its silence at the November 2 closing could represent nothing regarding the insurability of the sellers' title on that date. *Rice v. Taylor,* 32 P.2d 381, 384 (Cal.1934) (title insurance protects the insured against loss from defects affecting title at the time when policy issued; no implied agreement to indemnify against future encumbrances). The sellers could not assume that just because Commonwealth had insured 607 Partnership's title on a previous occasion, it would do so on the occasion of this transaction. Unless otherwise bound, a title insurer, like any insurer, is privileged to assess risks *de novo* when

---

**32.** For this reason, the sellers' contract claim also fails.

**33.** The sellers have not alleged any facts that would support the contention in their brief that Commonwealth may be held liable to them as a conveyancer for negligent examination of title. Thus we need not address the question whether a purchaser's title company may ever be liable

to a seller of real estate for its negligence in performing a title search. We note, however, that thus far our cases have adhered strongly to the privity requirement. *See Thornton v. Little Sisters of the Poor,* 380 A.2d 593, 595–96 (D.C. 1977); *Long v. American Sav. & Loan Ass'n,* 151 A.2d 770, 772–73 (D.C.1959); *cf. Doonis v. Mutual Title Co.,* 196 A.2d 480 (D.C.1964).

it is asked to issue a new policy. Commonwealth's silence at the closing represented nothing more than that—*silence* as to its position on the insurability of 607 Partnership's title. Without more, there was no representation one way or the other, and hence no basis on which to found the claims of misrepresentation and estoppel.

■ Thus, had the complaint alleged that Commonwealth acted only as a title insurer in conjunction with this sale, dismissal in the entirety would have been correct. The complaint further alleges, however, that Commonwealth undertook the conveyancing duties of settlement agent and escrowee. The sellers contend that in its capacity as settlement agent, Commonwealth owed both parties to the transaction the duty to deal fairly with each of them, *see Keith v. Berry*, 64 A.2d 300, 302–03 (D.C.1949), and that as escrow agent it was the fiduciary of both parties. *See Wagman v. Lee*, 457 A.2d 401, 404–05 (D.C.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 158, 78 L.Ed.2d 145 (1983). Commonwealth concedes these duties—as it must—but argues that the complaint fails sufficiently to allege a breach. We do not agree.

■ Commonwealth argues that it never breached the duties owed to the sellers as settlement agent and escrowee because settlement never occurred and it performed the escrow in accordance with the sellers' instructions. *See Spaziani v. Millar*, 215 Cal.App.2d 667, 30 Cal.Rptr. 658, 666 (1963) ("duty of an escrow holder [is] to comply strictly with the instructions of his principal"). Commonwealth maintains that when it put on its agent's hat, so to speak, it was entitled to ignore any special knowledge it had by virtue of being the purchasers' title insurer, and hence breached no duty to the sellers when it withheld information that, according to the complaint, it knew was vital to successfully completing the transaction. An agent owes his principal more than that. As a fiduciary respecting matters within the scope of the agency, RE-STATEMENT (SECOND) OF AGENCY § 13 (1958), the agent owes a duty of good faith and candor in affairs connected with the undertaking, including the duty to disclose to the principal "all matters coming to [the agent's] notice or knowledge concerning the subject [ ] of the agency, which it is material for the principal to know for his protection or guidance." *McHugh v. Duane*, 53 A.2d 282, 285 (D.C.1947); *see Spaziani*, 30 Cal.Rptr. at 667.

■ The complaint alleges that Commonwealth knew the insurable title condition was not satisfied and knew (or should have known) that the sellers did not possess that information; yet, despite this knowledge, it never intimated there was any problem with the sellers' title during the course of a five hour closing, not even when the sellers tendered their title documents in escrow. If proven, these allegations would establish a breach of duty at least at the point of tender, for then Commonwealth must have known it could not perform the escrow even if the purchasers changed their mind and decided to close the deal. The sellers' title was uninsurable, and, according to the complaint, Commonwealth knew both that fact and the sellers' ignorance of it. Whether as settlement agent or escrowee, the agent has a duty in such circumstances to alert the principal to the real state of affairs. RESTATEMENT (SECOND) OF AGENCY § 381 comment a (1958) (duty to give information arises when agent "has notice of facts which, in view of his relations with the principal, he should know may affect the desires of his principal as to his own conduct or the conduct of the principal...."); *see also id.* § 392 comment a (agent employed to complete a transaction for two principals must act with consideration for the interests of each). The sellers pleaded a cause of action for breach of fiduciary duty. Assuming they can prove every element of their claim—including proximate cause and actual damages—relief can be granted.

## V.

To summarize, therefore, in No. 91–CV–78 we reverse the judgment and remand for further consideration of whether the sellers met the "reasonable satisfaction" term of the agreement and whether they were prevented by the purchasers from

performing the condition precedent of delivering insurable title. In Nos. 90–CV–1425, *et al.*, we reverse the order dismissing the sellers' claim of breach of fiduciary duty, but otherwise affirm.

*So ordered.*