**Eric CHRISTIAN, Sr., as Administrator of the Estate of James George Sewer, et al., Plaintiff,**

v.

**ALL PERSONS CLAIMING ANY RIGHT, TITLE OR INTEREST IN ALL PROPERTIES KNOWN AND DESCRIBED AS: ALL PROPERTIES KNOWN AS NEWFOUND BAY, et al., Defendants.**

No. 398/1980.

District Court, Virgin Islands, D. St. Thomas and St. John.

June 5, 2001.

Desmond L. Maynard, St. Thomas, USVI, for Defendant Heirs of Amos Sullivan.

Irvin A. Sewer, St. Thomas, USVI, Pro Se for Heirs of Martin Sewer.

Cedrick Lewis, Doreen Williams–Lewis, St. Thomas, USVI, Pro Se for Estate of Bernard Williams.

## OPINION REGARDING MOTION FOR IMPOSITION OF SANCTIONS BY DEFENDANT HEIRS OF AMOS SULLIVAN and MOTION TO ENFORCE CONSENT JUDGMENT BY IRVIN SEWER

BROTMAN, District Judge (Sitting by Designation).

## I. INTRODUCTION

The underlying issues in this matter concern the boundaries of various parcels of property on the East End Quarter, St. John, U.S. Virgin Islands. A discussion of a case previously before this Court, which involved some of the same parties and related issues, is set forth in *Newfound Management Corp. v. Sewer*, 885 F.Supp. 727 (D.Vi.1995), *aff'd*, 131 F.3d 108 (3d Cir.1997) (the "1995 Opinion") and *Newfound Management Corp. v. Sewer*, 34 F.Supp.2d 305 (D.Vi.1999) (the "1999 Opinion").

Presently before the Court is Defendant Heirs of Amos Sullivan's (or "Sullivan") Motion for Hearing and for the Imposition of Sanctions and Irvin Sewer's Motion to Enforce Consent Judgment. Portions of Sullivan's motion were previously decided by the Court. Those remaining issues of the Sullivan's motion are: (1) Sullivan's request to compel Defendant Estate of Bernard Williams and Defendant Irvin Sewer for the Heirs of Martin Sewer to share in the land surveying costs for Parcel No. 6q Hansen Bay, also known as "Robert Avison," and Parcel No. 6r Hansen Bay, also known as "Blackrock;" (2) Sullivan's request for attorney fees and costs connected with this motion; and (3) Sullivan's request that the Court approve the surveys of Parcel 6q and Parcel 6r so that they may be properly recorded and filed. *See* Hearing on December 20, 2000 at Hearing Tr. 6.23–6.25. Cedrick Lewis ("Lewis"), as Administrator of the Estate of Bernard Williams, and Irvin Sewer ("Sewer"), representing the Heirs of Martin Sewer, oppose this motion. On December 9, 1999, the Court heard argument on Sullivan's motion. This matter was continued, upon which it was referred to civil mediation. Mediation having failed, the motion was revisited for argument on December 20, 2000. Following the December 20, 2000 Hearing, both the Heirs of Amos Sullivan and Irvin Sewer for the Heirs of Martin Sewer submitted Proposed Find-

ings of Fact and Conclusions of Law to the Court regarding this matter.

On or about January 31, 2001, Defendant Irvin Sewer filed a Motion to Enforce Consent Judgment. In this motion, Sewer requests that the June 2, 1994 Consent Judgment "be enforced to the full extent that the law provides." (*See* Mot. to Enforce Consent Judgment at 1.) This motion is decided without oral argument pursuant to Fed.R.Civ.P. 78.

After a careful review of the record, the Court enters the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. CONSENT JUDGMENT

1. On June 2, 1994, the parties entered into a Consent Judgment, which represented the settlement of several parties' claims to numerous pieces of real property on the East End Quarter, St. John, U.S. Virgin Islands.

2. Under the terms of the Consent Judgment, certain properties were to be divided among specific Defendants and surveyed, with the costs of the survey to be shared pro rata by all parties. Specifically at issue is the division of two parcels under the Consent Judgment: Parcel 6q Hansen Bay, East End Quarter, St. John, Virgin Islands ("Parcel 6q"), and Parcel 6r Hansen Bay, East End Quarter, St. John, Virgin Islands ("Parcel 6r").

#### 1. The Consent Judgment's Discussion of Parcel 6q

3. The Consent Judgment mandates that Parcel 6q be divided into three sections. *See* Consent Judgment, dated June 2, 1994 ("Consent Judgment"), at 2. Title of the three sections is awarded in the following proportions:

   a. To the Heirs of Amos Sullivan:

     1) ¾ of an acre together with,

     2) ½ interest in the half acre portion called "John George," and

     3) ⅛ interest in the remaining 1¾ acre portion.

   b. To the Estate of Bernard Williams:

     1) ¼ interest in the half acre portion called "John George," and

     2) ⅛ interest in the remaining 1¾ acre portion.

   c. Irwin Sewer for the Heirs of Martin Sewer:

     1) ¼ interest in the half acre portion called "John George," and

     2) ⅛ interest in the remaining 1¾ acre portion.

4. The Consent Judgment includes a "mutual approval provision" with respect to Parcel 6q. This provision provides that "[t]his parcel shall be surveyed and the survey shall be subject to the mutual approval of the defendants who are awarded title thereto under this judgment, prior to recording." *See* Consent Judgment at 3.

5. The Consent Judgment requires that the parties taking title to Parcel 6q pay for the costs of the survey of Parcel 6q in the same proportions in which they take title.

6. The boundaries of the ½ acre portion of Parcel 6q known "John George" are not disputed at this time.

#### 2. The Consent Judgment's Discussion of Parcel 6r

7. The Consent Judgment ordered that Parcel No. 6r, also known as "Black Rock," "consisting of 7.5 acres, more or less, as shown on survey No. D9–1076–T72 by Louis Harrigan, is to be

divided into [three] sections, to be awarded to the following parties[:]" (*See* Consent Judgment at 3.)

a. To the Heirs of Amos Sullivan: an undivided ½ interest;

b. To the Estate of Bernard Williams: an undivided ¼ interest; and

c. To Irvin Sewer for the Heirs of Martin Sewer: an undivided ¼ interest.

(*See* Consent Judgment at 3–4.)

8. The Consent Judgment does not include a "mutual approval" provision with respect to Parcel 6r.

## B. THE SURVEYS OF PARCEL 6Q AND PARCEL 6R

9. Edward Gibney ("Gibney") performed the survey of parcels 6q and 6r. Gibney has been a registered land surveyor, exclusively within the Virgin Islands, since 1985. (*See* December 9, 1999 Hearing Transcript, at 39.01.)

10. Gibney began the surveys of Parcel 6q and 6r in the Summer of 1995. (*See* id. at 40.15.) He completed these surveys at the end of the Summer of 1996.

11. The survey of Parcel 6q is dated November 14, 1996, and was filed with number D9–6177–T97. (*See* id. 41.10–41.12.)

12. The survey of Parcel 6r is dated June 5, 1996, and was filed with number D9–6103–T96. (*See* id. at 41.06–41.09.)

### 1. Gibney's Survey of Parcel 6q

13. Gibney's survey determined that Parcel 6q was close to seven acres, even though a previous survey done by Louie Harrigan had determined that it was approximately three acres.

(*See* December 9, 1999 Hearing Transcript at 43.21–43.23, 46.10–46.12.)

14. Gibney did not take land from any other parcel in his determination that Parcel 6q is almost seven acres. (*See* id. at 45.11–45.15.) Furthermore, Gibney respected the existing land boundaries of the parcels adjacent to Parcel 6q. (*See* id. at 45.12–45.15.)

15. Gibney testified that his acreage determination differed from Harrigan's survey of Parcel 6q because Harrigan survey had numerous discrepancies, "didn't make sense," and was "obviously incomplete." (*See* December 19, 1999 Hearing Tr. at 51.10–51.13.)

16. Gibney began his survey of Parcel 6q by trying to reestablish the Harrigan survey. Gibney was unable to find markers because their location as shown on the Harrigan map fell nowhere near any fences, walls, or anything else that would indicate a property boundary. (*See* id. at 51.17–51.23.) Gibney had found "other boundaries in some cases nearby, and in some cases not too close, that appeared to be clearly property boundaries." (*See* id. at 51.23–52.01.) Gibney then proceeded "to research surveys of existing property, and found that they largely supported the fences and other features that [he was] finding." (*See* id. at 52.02–52.05.) After his research, Gibney proceeded "back and forth in the field" to determine the probable boundary for Parcel 6q. (*See* id. at 52.06–52.08.)

17. In addition to field research and the Harrigan survey map, Gibney studied maps of the adjacent surveys, the Virgin Islands Tax Map, a video of Sewer marking a fence corner and describing the top of Parcel 6q, and a

1977 survey of part of Parcel 6q by Sidney Baptiste in making his survey of Parcel 6q.

18. Sewer's opposition with the Gibney survey of Parcel 6q is twofold: (1) the Gibney survey's acreage determination is different from the acreage description outlined in the Consent Judgment, and this change, Sewer contends, violates the Consent Judgment;[1] see id. at 23, and (2) Sewer did not participate in the survey of Parcel 6q.

**2. Gibney's Survey of Parcel 6r**

19. Gibney's survey concludes that Parcel 6r is seven and a half (7.5) acres. This acreage amount conforms with the description of Parcel 6r in the Consent Judgment. (See Consent Judgment at 3.)

20. Sewer does not disagree with the survey of Parcel 6r itself. (See December 9, 1999 Hearing Transcript at 22.) Sewer's opposition to the survey of Parcel 6r stems from the fact that he did not participate in it. (See id. at 23.)

**C. EFFORTS BY HEIRS OF AMOS SULLIVAN TO OBTAIN FINANCIAL ASSISTANCE AND APPROVAL FOR THE SURVEYS**

21. The cost of the surveys, totaling $11,000, has been paid in whole by the Heirs of Amos Sullivan.

22. Parcel 6q and Parcel 6r remain undivided and the Heirs of Amos Sullivan continue to pay the property taxes on the land.

22. Sometime after the parties entered into the Consent Judgment, the relevant parties to this motion communicated with each other in order to effectuate the judgment's terms with respect to Parcel 6q.

23. In a letter, dated March 1, 1996, Egberg George ("George"), acting on behalf of the Heirs of Amos Sullivan, informed Lewis and Sewer that Edward Gibney was performing the surveying of Parcels 6r and 6q. George further requested assistance in financing the project. (See Motion for Hearing and for the Impositions of Sanctions ("Sullivan Mot.") at Exh. B.) The letter to Sewer states:[2]

> As you know, we all agreed to have our properties surveyed approximately a year and a half ago. As you further know, we selected a surveyor (Mr. Gibney) to do the surveying. I discussed this matter with you and you had no problem with Mr. Gibney doing the surveying of our properties. However, you did suggest that we use a friend of yours (Mr. Callwood) .... I'm sure you recall, we did not object to

---

1. Sewer states that the Consent Judgment describes Parcel 6q as being three acres in size. This determination is made by analyzing the Consent Judgment's description of the apportionment of the parcel. Under the terms of the Consent Judgment, the Heirs of Amos Sullivan are awarded a ¾ acre portion outright, a one half interest in the half acre portion called "John George;" and a one third interest in "the remaining 1¾ acre portion." The Estate of Bernard Williams is awarded a ¼ in interest in "John George" and a one third interest in the remaining 1¾ acre por-

tion. Irvin Sewer for the Heirs of Martin Sewer is awarded a ¼ interest in "John George" and a one third interest in the remaining 1¾ acre portion. (See Consent Judgment at 3.) Adding the described acreage together-the ¾ acre plus the ½ acre portion called "John George" plus the "remaining 1¾ acre portion"—amounts to a total of three acres.

2. George sent a substantially similar letter to Lewis.

this. Approximately six months later, you notified me that Mr. Callwood was unable to do the survey for various reasons. We acknowledged Mr. Callwood's decision, and simply continued as originally planned, using Mr. Gibney to do the surveying. As of this date, Mr. Gibney is still doing the survey of the properties of Black Rock and Robert Avison.... As soon as we get more information, I'll be sure to relay it to you. Meanwhile, we would appreciate any and all assistance you can give towards financing this project.

(*See* Sullivan Mot. at Exh. B, Letter, dated March 1, 1996.)

24. Sewer responded to Egbert's letter with his own letter, dated March 19, 1996. In his letter, Sewer states:

It is true that we, in accordance with the consent judgment of June 2, 1994, agreed to have our properties surveyed; and it is also true that you conferred with me, sometime thereafter, as to what my thoughts were in regards to the possibility of hiring Mr. Gibney to do the surveys for us. As I recall, my response was that I did not know him, but I guessed that he would have been O.K. However, I did indicate that I preferred Mr. Angel Callwood—under the guidance of Mr. Galiber—to do the job for us, mainly because of his integrity and professionalism, his already having been familiar with the area, and because I believed that my and my nephews' working along with him, as we had been doing in Long Bay, would have translated into reduced and more affordable costs. And as you had indicated, you had

no objections to Mr. Callwood doing the surveys.

(*See* id.)

25. Sewer's March 19, 1996 letter continues to explain the reasons that Mr. Callwood is "unable" to do the survey:

he is a stickler for performing his work at the highest level of accuracy and professionalism of which he is capable; and he has indicated, on numerous occasions, that if we expect him to do anything less, then we are free to find another surveyor who would do what we want him to do, instead of doing what a competent surveyor ought to do.

(*See* Sullivan Mot. Exh. B, March 19, 1996 Letter at 3.)

26. Sewer's March 19, 1996 letter also addresses the surveys of Parcels 6q and 6r, which were being performed by Gibney:

Although your letter gives the impression that I knew that you and your family had decided to and, in fact, hired Mr. Gibney to survey the aforementioned properties, until I read your letter of March 1, 1996, my family and I were totally unaware that you had, and that the surveying of Parcels 6q and 6r has been in progress for sometime.... I am very much disturbed by your decision to authorize surveying before notifying me and, perhaps, Mr. Cedrick Lewis, .... In regard to your asking me to assist in financing the surveying project which you have authorized, and which is well on its way, I must be consistent and refuse .... I would like to state, unequivocally, that I do not approve of the surveying of Parcels 6q and 6r at this point in time, especially as there is no indication that Mr. Gibney has done his homework (proper

research) or is performing the surveys of these parcels in accordance with standard surveying principles and procedures . . . .

(*See* id.)

27. On or about July 27, 1996, the Heirs of Amos Sullivan (represented by Alfred Sullivan, Dennis George, and Egbert George) met with Sewer (accompanied by Lyle Baptiste) and Lewis "to discuss the cost and progress of the survey of parcels Hansen Bay 6r (Black Rock) and Hansen Bay 6q (Robert Avison) . . . and request assistance in paying survey expenses." *See* Sullivan Mot. at Exh. B, Egbert George Affidavit. George states, that "[a]t the conclusion of the meeting, no favorable input to the surveys was offered by the Heirs of Bernard Williams and Martin Sewer. No commitment to sharing in the cost of the survey was received from the Heirs of Bernard Williams and Martin Sewer." *See* id.

28. In a letter, dated August 6, 1996, Sewer refers to the July meeting and states:

> I would not have imagined that you would ask me to attend such a meeting, knowing very well that I objected to anyone surveying the property who was not willing to do the necessary research and adhere to standard surveying practices, principles and procedures . . . . I was unaware that you had chosen to ignore my objections and had him [Gibney] continue with the survey.

(*See* Sullivan Mot. at Exh. B., Sewer Letter, Dated August 6, 1996.)

29. On this same date, Sewer wrote another letter to George. In this letter, he reaffirms his reasons for not accepting the survey, and his objections regarding the increase in the acreage amount of Parcel 6q:

> [Y]ou mentioned, near the ending of the meeting on Saturday, July 27, 1996, that you were getting ready to have Robert Avison surveyed. You also indicated—based on monuments you found in the field, and which you believe depict the boundaries of Robert Avison/6q Hansen Bay—that Parcel 6q is six (6) acres, or thereabout, instead of three (3) acres as it is recorded in the July 3, 1913 Declaration, as well as on 1913 and subsequent land lists . . . . I . . . indicated to you and all present, in no uncertain terms, that I objected to this apparent madness of arbitrarily increasing the sizes of properties . . . . In closing, my [sic] I suggest that you stop and seriously reconsider your position and objective(s) . . . .

(*See* Sullivan Mot. at Exh. B, Second Sewer Letter, Dated August 6, 1996.)

30. Sewer asserts that the primary purpose for referring to the "1913 Declaration," both in the August 6, 1996 letter and later at the December 9, 1999 Hearing before the Court was for "providing relevant historical evidence to show that said historical documents all corroborate the Consent Judgment, in that they all recorded Parcels 6q and 6p as 3–acre and 4–acre parcels respectively." (*See* Sewer's May 1, 2001 Letter to Court at 1.)[3]

---

**3.** Sewer's reference to Parcel 6p alludes to the Court's 1999 Opinion, which accepted a survey of Parcel 6p that determined its size as 7.01 acres and not the four acres as described in the Consent Judgment. *See Newfound Management Corp.,* 34 F.Supp.2d at 312–313. The Court's earlier determination has not

31. The 1913 Declaration includes the following statement: "It is understood, that the acreage mentioned above is only calculatory and approximately [sic] and may be found different when any measuring should be made." (*See* 1913 Declaration at 4, attached to Sewer's May 1, 2001 Letter.)

32. In a letter, dated March 21, 1997, George advised Sewer that the surveys of Parcel 6q and Parcel 6r were completed. The letter additionally outlines Sewer's share of surveying costs and property taxes. (*See* Sewer's Prop. Findings of Fact at ¶ 24.)

33. Sewer did not respond to this letter.

34. Gibney's expert testimony and survey clearly establish that the acreage amount of Parcel 6q is actually almost seven acres, and not three acres. There is no evidence to contradict this determination.

35. The apparent change in the acreage amount of Parcel 6q does not modify the parcel's boundaries as understood by the parties upon entry of the Consent Judgment, nor does the determination modify the sizes or boundaries of the surrounding parcels. There is no evidence to contradict this finding.

36. Lewis opposes the Gibney's surveys because "it was my understanding that we would get together, select a surveyor, we would go in the field and identify the property and the ground. Instead of that, the Sullivans went ahead, selected the surveyor, went out in the field, laid it out where they wanted it to be, fenced off their portion that they figure is theirs, and then called us afterwards and said,

'The balance ... over there is all yours.'" (*See* December 9, 1999 Hearing Transcript at 13.02–13.10.)

37. The Movants now request that the Court compel Defendant Estate of Bernard Williams and Defendant Irvin Sewer, for the Heirs of Martin Sewer, to share in the surveying costs according to their respective interest in the parcels. Sullivan further requests that the Court accept the Gibney surveys, insofar as Sewer and Lewis have refused to give their approval of them.

38. At the December 20, 2000 Hearing, after argument on the motion, the Court directed Sewer to have the property surveyed by a surveyor at his own cost.

39. On January 15, 2001, Sewer, Williams, and the Heirs of Amos Sullivan convened a meeting at the request of Sewer, to discuss "certain particulars relative to having Parcel 6q surveyed in accordance with the Court's mandate." (*See* Sewer's Proposed Finding of Facts and Conclusions of Law at ¶ 36.) At the meeting:

> Sewer indicated and emphasized that in order to ensure that the survey of Parcel 6q would meet with the mutual approval of the parties taking title to said property, it would be absolutely necessary for said parties to first agree that the parcel is three (3) acres as stated in the Consent Judgment. Then, (after they agree that the size must conform with the acreage stipulated in the Consent Judgment, and before having a surveyor begin surveying), to go the [sic] site together and determine and agree among themselves, what the boundaries of the property would be.

been appealed and is not being re-litigated today.

(*See* id. at ¶ 39.)

40. "In response, the Sullivans indicated that they accept their surveyor's survey of the property; and as they were not ordered to do a survey, they see no reason for them to become involved, as Sewer wants them to be." *See* id. at ¶ 40.

41. As of this date, no alternate survey has been submitted to the Court. Furthermore, no evidence has been submitted to substantiate any claims that Gibney did not adhere to acceptable surveying practices, or that Gibney's acreage determination of Parcel 6q affects surrounding parcels.

## III. CONCLUSIONS OF LAW

■ 1. V.I. Code Ann. Tit. 1, § 4 (2000) states: "The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary." *See James v. Zurich–American Insurance Co.,* 203 F.3d 250, 255 (3d Cir.2000) ("[T]he ALI Restatements of the Law (thus including the Restatement (Second) of Contracts ('Restatement')) have been adopted as definitive sources of rules of decision by the Virgin Islands Legislature"); *Action Engineering v. Martin Marietta Aluminum,* 670 F.2d 456, 458 (3d Cir. 1982).

2. Thus, under § 4, the Court must look first to the common law rules set forth in the various Restatements. *Dunn v. HOVIC,* 1 F.3d 1371, 1387 (3d Cir.1993). If no rules are available, the Court is to look to common law rules "as generally understood and applied in the United States." *Id.* (quoting *Edwards v. Born, Inc.,* 792 F.2d 387, 389 (3d Cir.1986)); *see also, Polius v. Clark Equipment Co.,* 802 F.2d 75, 77 (3d Cir.1986)). Where the Restatement is silent and a split of authority exists, the Courts should select the sounder rule. *See Polius,* 802 F.2d at 77 (citing *Wells v. Rockefeller,* 728 F.2d 209 (3d Cir.1984)).

## A. GENERAL CONTRACT PRINCIPLES APPLY TO CONSENT JUDGMENT

■ 3. A consent judgment is a "hybrid of a contract and a court order. A decree embodies the agreement of the parties and as such is in some respects contractual in nature; however, a decree is also in the form of a judicial order that the parties expect will be subject to the rules generally applicable to other judgments and orders." *Holland v. New Jersey Dept. of Corrections,* 246 F.3d 267, 276 (3d Cir.2001) (citing *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). "Although consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken." *Fox v. United States Department of Housing and Urban Development,* 680 F.2d 315, 319 (3d Cir.1982) (citing *Philadelphia Welfare Rights Org. v. Shapp,* 602 F.2d 1114, 1119–1120 (3d Cir.1979), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980)); *see also, Local Number 93 v. Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (citations omitted) ("[C]onsent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the

parties, consent decrees also closely resemble contracts").

4. As consent decrees have many of the attributes of contracts, a court should interpret them with reference to traditional principles of contract interpretation. *United States v. New Jersey*, 194 F.3d 426, 430 (3d Cir.1999) (citations omitted); *see United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (Interpretations of consent decrees for the purposes of enforcement and for determining its scope are generally guided by contract principles).

5. As general contract principles apply to the construction and interpretation of the Consent Judgment at hand, the Court will look to the Restatement (Second) of Contracts for guidance in interpreting the decree. In the instance that no rules are available, the Court will rely upon general contract principles as applied in the United States.

## B. COURT MAY CONSIDER GIBNEY'S SURVEY OF PARCEL 6Q

6. As an initial matter, the Court notes that when interpreting a consent judgment, it must "discern the scope of a consent decree by examining the language within its four corners." *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d Cir.1998) (citing *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)). In addition, the consent judgment should be construed so as to give effect to all of its parts. *See Pan American Realty Trust v. Twenty One Kings, Inc.*, 297 F.Supp. 143, 149 (D.Vi.1968).

7. Resort to extrinsic evidence and considering evidence beyond the decree's "four corners" is only permissible when the decree itself is ambiguous, although circumstances surrounding its formation are always relevant to its meaning. *See New Jersey*, 194 F.3d at 430 (citing *Fox*, 680 F.2d at 319–20).

8. Extrinsic or parol evidence may be considered, however, to establish the fact of mistake. *See* Restatement (Second) of Contracts § 214(d) (stating that evidence of prior contemporaneous agreements and negotiations are admissible in evidence to establish illegality, fraud, duress, mistake, lack of consideration, or any other cause invalidating a contract).

9. In particular, a court should consider extrinsic evidence tending to show a mistake made in the description of land where there are sufficient other facts in the description to identify the land. *See* 23 Am.Jur.2d Deeds § 310 (1983); *see also, Bilbao v. Krettinger*, 91 Idaho 69, 415 P.2d 712, 716 ("Parol evidence is admissible to prove that by reason of mutual mistake a written instrument does not express the intention or agreement of the parties thereto").

10. The admissibility of extrinsic evidence for the purposes of establishing a mistake in a written instrument is necessary because evidence of mistake is seldom found in the instrument itself. Without the consideration of such evidence, an aggrieved party would have little hope of redress. *See* Am.Jur.2d Reformation of Instruments § 118 (1973).

## C. MUTUAL MISTAKE REGARDING THE ACREAGE OF PARCEL 6Q

11. A mutual mistake is "one common to both or all parties, wherein each labors under the same miscon-

ception respecting a material fact, the terms of the agreement, or the provision of a written instrument designed to embody such an agreement." *RGS, Cardox Recovery, Inc. v. Dorchester Enhanced Recovery Co.*, 700 S.W.2d 635, 639 (Tex.App. 13 Dist. 1985).

12. Pursuant to the Restatement (Second) of Contracts § 152 (1979 Main Vol.):

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154
>
> . . . .

13. Integral in determining whether to apply the mutual mistake doctrine, which allows for the rescission of the agreement, is whether the mistake of the parties is material. *See Horner v. Bourland*, 724 F.2d 1142, 1145 (5th Cir.1984).

14. Here, the parties made assumptions regarding the acreage amount based on a previous survey of Parcel 6q, which had indicated that the parcel was three acres. This mistaken belief, however, is not material to the agreement itself.

15. The language "the remaining 1¾ acre portion" was included to differentiate this portion of Parcel 6q from other portions of Parcel 6q (i.e., from "the half-acre portion called 'John George'" and the "3/4 of an acre" portion awarded outright to the Heirs of Amos Sullivan). The acreage descriptions within the Consent Judgment's discussion of Parcel 6q were included to further identify the prop-

erties, not to define the parcel's size or boundaries.

16. The essence of the agreement with respect to Parcel 6q was not to award a certain number of acres to the parties, but to divide the property between the three Defendants in the proportions as outlined in the Consent Judgment. The specified acreage language regarding Parcel 6q merely affects a matter collateral to the division of the property.

17. Because the mistake as to the acreage amount of Parcel 6q was not material, rescission of the Consent Judgment would not be appropriate.

18. Recognizing that the acreage description of Parcel 6q is collateral to the crux of the parties' actual agreement does not violate the Consent Judgment and is consistent with accepted surveying practices as well as the Court's previous determinations.

19. The Court's 1995 Opinion specifically discusses the consideration of acreage descriptions in relation to generally accepted surveying principles and practices. *See* 885 F.Supp. at 749–756. In the 1995 determination, the Court recognized that "acreage is less reliable as a means of determining the location and boundaries of the described property when more substantial evidence exists." *See id.* at 750. "Surveyors who retrace old surveys in the Virgin Islands and other rural areas have found stated acreage to be the least reliable indicia of a parcel's original boundaries." *See id.* at 759 (citations omitted). Thus, in the 1995 Opinion, where a surveyor had followed well-established surveying practices and territorial law to resurvey Parcel 6–0, the Court accepted that resurvey, even though the resurvey calculated a

different acreage amount than a previous 1956 Harrigan survey. *See id.* at 757–58.

20. Furthermore, the focus on proper boundaries, rather than on adherence to previous acreage determinations, conforms with well-accepted surveying practices. "While a survey may demonstrate that a stated acreage amount is incorrect, a survey may not carve out (or eliminate) parcels of adjacent land and add them to the first parcel to increase (or diminish) the acreage to conform to the quantitative description in the deed." *Id.* at 750. That being so, Sewer's suggestion that the parties first "agree that [Parcel 6q] is three (3) acres as stated in the Consent Judgment" before a surveyor begins surveying, and requiring that the subsequent survey conform to this acreage amount, contravenes generally accepted surveying practices. While the Court does not decide the reasonableness of the parties' settlement as outlined in the Consent Judgment, Sewer's suggestion clearly undermines his reliance on the argument that one of his objections to the survey of Parcel 6q is that the survey was "not done in compliance with standard and generally accepted surveying practices, principles, and procedures." *See* Sewer's Proposed Findings of Fact at ¶ 22d.

21. In the 1999 Opinion, the Court again recognized that acreage descriptions were, at times, less reliable then other means for determining property boundaries. There, the Court accepted a survey over Sewer's objections, which indicated that Parcel 6p was 7.01 acres, more or less, and not "approximately four acres" as described in the Consent Judgment. *See id.* at 313. Because the surveyor was competent and used satisfactory surveying

technique, and Sewer did not offer any affirmative evidence demonstrating another surveyor would have come to a different conclusion, the Court accepted the survey of Parcel 6p. *Id.* at 311–312. Like the situation at hand, the acreage description of Parcel 6p was deemed to have been "included to further identify the parcel, not to define its size or boundaries." *Id.* at 313.

22. Ruling that new evidence or resurveys trump inaccurate acreage determinations is not new. For instance, in *Pendall v. Virgin Islands Title & Trust Co.,* 279 F.Supp. 733 (D.Vi. 1968), a deed stated that two parcels "consist[ed] of 1.6067 U.S. Acres and 2.9246 U.S. Acres, respectively, or a total of 4.5313 U.S. Acres." *Id.* at 734. A resurvey of the parcels revealed that the total acreage was only 3.5591 acres, a deficiency of 0.9722 acres, and the court accepted that resurvey. *Id.* Under such circumstances, the court held that "the description by metes and bounds prevails over the inconsistent reference to acreage." *Id.* (citing *Thorp v. Smith,* 344 F.2d 452 (3d Cir.1965)).

23. In light of the immateriality of the parties' mutual mistake regarding Parcel 6q's proper acreage, the Court finds that the parties may still obtain the benefit of their bargain in substantial accordance with the Consent Judgment.

24. The Fifth Circuit applied an appropriate remedy to a situation analogous to the one at hand. *See Horner,* 724 F.2d at 1146. In *Horner,* the parties had entered into an contract for the sale of real estate, which specifically provided that the purchase price would be paid by "recasting" (essentially, refinancing) a loan with the FHA. *See id.* at 1144. It

was later determined that recasting with the FHA was impossible. The Fifth Circuit found that this mutual mistake was not material to the transaction, where a cash payment would bestow upon the sellers a substantially equivalent benefit as recasting the loan. *See id.* at 1146. The Fifth Circuit thus found that in light of the immateriality of the mistake, the district court abused its discretion in denying the buyer plaintiff specific performance of the parties' contract to sell real estate when a cash payment could be made. *Id.* at 1149.

25. In the case at hand, dividing "the remaining 1¾ acres" amongst the parties is impossible in light of the new evidence that the parcel is closer to seven, rather than three acres. The "remaining portion" cannot equal 1¾ acres. However, it is the division of the parcel, not the amount of acreage, that is material to the Consent Judgment. Dividing the "remaining portion" without regard to whether that portion is 1¾ acres or some other amount provides each party a substantially equivalent benefit: a ⅛ interest of the remaining portion of Parcel 6q. The parties are thereby bound to the essence of their agreement, which is to divide Parcel 6q by the proportions outlined in the Consent Judgment.

26. The Court finds that the following division of Parcel 6q represents the intent of the relevant parties:

b) To the Heirs of Amos Sullivan: ¾ of an acre of Parcel 6q, ½ interest in the portion called "John George," and a ⅛ interest in the remaining portion of Parcel 6q;

c) To the Estate of Bernard Williams: ¼ interest in the portion called "John George" and a ⅛ interest in

the remaining portion of Parcel 6q; and

d) To Irvin Sewer for the Heirs of Martin Sewer: ¼ interest in the portion called "John George" and a ⅛ interest in the remaining portion of Parcel 6q.

## D. PARTIES' OBLIGATIONS WITH RESPECT TO THE MUTUAL APPROVAL REQUIREMENT

27. All contracts impose on each party a duty of good faith and fair dealing. *See* Restatement (Second) of Contracts § 205 (1981).

28. The mutual-approval provision of the Consent Judgment with respect to Parcel 6q is similar to a contract provision which requires satisfaction of a party as a condition precedent to a duty to perform. Under the Consent Judgment, Sewer and Lewis have no duty to "perform"—that is, grant approval to effectuate the proper recording of Parcel 6q—until they are, to some extent, "satisfied" with the survey.

29. Under § 228 of the Restatement (Second) of Contracts ("Restatement"), entitled "Satisfaction of the Obligor as a Condition: When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied."

30. Where it is impracticable to apply the objective reasonable person standard described in § 228 of the Restatement, a party's conduct will be

reviewed under a subjective standard of good faith and fair dealing.

31. Contracts that call for satisfaction as to commercial value or quality, operative fitness, or mechanical fitness utility are interpreted under a reasonableness standard as described in § 228 of the Restatement (Second) of Contracts. *See Action Engineering,* 670 F.2d at 461 (citation omitted); *see also Mike Naughton Ford, Inc. v. Ford Motor Company,* 862 F.Supp. 264, 269 (D.Colo.1994) (citing *Brant Const. Co. v. Metropolitan Water Reclamation Dist.,* 967 F.2d 244, 247 (7th Cir.1992); *Ward v. Flex–O–Tube Co.,* 194 F.2d 500, 503 (6th Cir.1952)). Conversely, contracts with satisfaction clauses that require the consideration of a multiplicity of factors, and involve matters of fancy, taste, sensibility and judgment, are assessed under a subjective, good faith standard. *See Action Engineering,* 670 F.2d at 461 (citation omitted); *Mike Naughton Ford,* 862 F.Supp. at 269 (citations omitted).

32. Where a "satisfaction" provision is ambiguous as to whether the parties intended an objective or subjective standard to apply, § 228 of the Restatement states only a preference for the objective standard when "it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied." *See Action Engineering,* 670 F.2d at 460. Thus, "[p]erformance of a condition requiring satisfaction of a party may be tested for reasonableness if there is no contrary contractual intent and it is not otherwise impracticable for the

court to do so." *See Aronoff v. Lenkin Co.,* 618 A.2d 669, 678 (D.C.1992). However, "if it is clear that the contract intended to leave a decision to one party subject only to the requirement of good faith, then the courts should not imply an additional requirement of reasonableness." *See* id. (citing Restatement (Second) of Contracts, Comment a).

33. Here, the Consent Judgment mandates the following with respect to Parcel 6q: "This parcel shall be surveyed and the survey shall be subject to the mutual approval of the defendants who are awarded title thereto under this judgment, prior to recording." (*See* Consent Judgment at 3.) The Consent Judgment's express terms provide no objective criteria or further guidance as to how a party's approval or disapproval is to be reviewed or measured. The parties' intentions as to the scope of the word "approval" is thus unclear.

34. Because the Consent Judgment is ambiguous as to a term of the agreement, the Court may consider reliable evidence outside the four corners of this document in order to determine the intent of the parties. *See* Restatement (Second) of Contracts § 202 (1979); *see also, New Jersey,* 194 F.3d at 430 (citations omitted).

35. One purpose of the parties in forging the Consent Judgment was the prompt resolution of claims, in order to avoid further lengthy and costly litigation regarding property ownership and boundary disputes. To effectuate this settlement, compromise was necessary.[4]

---

**4.** For example, with respect to Parcel 9d Newfound Bay, (another parcel discussed in the Consent Judgment) the agreement states that the "size, location, and parcel number ... [were] agreed upon by the parties to this litigation as a compromise of a dispute." (*See* Consent Judgment, at 5.)

36. Allowing one party to evade the implementation of certain terms of the Consent Judgment based on his or her own subjective opinion conflicts with the spirit of the agreement.

37. The Court thus finds that the parties could not have intended that the "mutual-approval" provision would provide a party limitless personal discretion to withhold approval.

38. Furthermore, here, it is practicable to apply an objective standard. The Court's 1995 Opinion contains an extensive discussion regarding proper surveying practices. *See* 885 F.Supp. at 747–757. The basic principles of good surveying practice are objective and specific: the surveyor must, among other things, perform research, collect and examine a combination of documentary, testimonial and field evidence, trace the original surveyor's footsteps (in the case of a resurvey), and make a thorough search for physical evidence. *See id.* Using these guidelines, it is not difficult to analyze whether a reasonable person would approve a survey.

39. The Court will therefore review Sewer and Lewis' conduct of withholding their approval of the survey of Parcel 6q under the objective, "reasonable person" standard, both because a subjective standard would conflict with the spirit of the agreement, and because it is practicable to do so.

### 1. The Court's Review of Sewer and Lewis' Conduct under an Objective Standard With Respect to Parcel 6q

40. Here, there is no evidence to suggest that Gibney's survey of Parcel 6q is in any way inaccurate or that Gibney did not adhere to proper surveying principles.

41. While the survey of Parcel 6q does modify its acreage amount from the description of the property within the Consent Judgment, Gibney satisfactorily explains the reasons for the apparent change.

42. Because the Consent Judgment's description as to the acreage amount of Parcel 6q was not material to the agreement (*see* discussion *supra* Part III.C.), a reasonable person would not mandate that the parcel's survey match the acreage description where the survey was done in accordance with acceptable surveying practices, and where none of the surrounding parcels were affected by the apparent change. Thus, a reasonable person would grant approval of Gibney's survey of Parcel 6q. Sewer and Lewis' refusal to grant that approval is therefore unreasonable, and amounts to a breach of their obligations under the Consent Judgment.

### 2. The Court's Review of Sewer and Lewis' Conduct Under a Subjective Standard With Respect to Parcel 6q

43. Even if a subjective "good faith and fair dealing" standard applied, the Court would still find that Sewer and Lewis' refusal to approve the survey amounts to a breach of their contractual duties under the Consent Judgment.

44. "Good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. *See* Restatement (Second) of Contracts § 205 Comment a. Good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it

excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Id.; see also, Hooters of America, Inc. v. Phillips,* 173 F.3d 933, 940 (4th Cir.1999) (citing Restatement (Second) of Contracts, § 205 cmt. a..) " 'Good faith ... encompasses, among other things, an honest belief, the absence of malice ... [and] being faithful to one's duty or obligation." *See* BLACK'S LAW DICTIONARY, 693 (6th Ed.1990). "Subterfuges and evasions violate the obligations of good faith in performance even though the actor believes his conduct to be justified." *See* Restatement (Second) of Contracts § 205 Comment d.

45. Comment d of the Restatement presents examples of "bad faith" to include: the "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance." *See id.*

46. Thus, with respect to a satisfaction clause, the subjective standard of good faith and fair dealing does not allow a party to claim dissatisfaction based on just *any* reason. A far-fetched or irrational rationale, even if honestly held, cannot satisfy the duty of good faith. Allowing such broad discretion within a contract would enable a party to freely evade his or her duty to perform, thereby creating an illusory promise.

47. As stated above, the Consent Judgment represented an economical and prompt resolution of the various parties' claims. To that end, it is a reasonable expectation of all relevant parties that the approval of a survey is not denied arbitrarily, so as to deprive another the property awarded under the agreement.

48. Here, Sewer and Lewis fail to establish any credible, rational basis for rejecting Gibney's survey of Parcel 6q. While a differing acreage determination understandably arouses some concern as to the accuracy of the survey, the parties are well aware of the law of surveying, which recognizes the unreliability of stated acreage relative to other boundary indicators. Again, no other parcel's boundaries were affected and no evidence exists contradicting the expert's testimony that he adhered to proper surveying principles.

49. Under these circumstances, where a Consent Judgment was entered into by the parties who intended to arrive at a prompt and economical resolution of certain claims and untangle this property from the web of further litigation, Sewer and Lewis' refusal to approve the survey of 6q amounts to an evasion of the spirit of the agreement and contravenes the justified expectations of the parties. Their actions reveal attempts to impede the implementation of the Judgment's agreed-upon provisions. Sewer and Lewis have therefore violated the duty of good faith and fair dealing inherent in every contract.

50. The Court further finds that Sewer and Lewis' actions contravened their obligations under the Consent Judgment, including the provisions related specifically to Parcel 6q and the general obligation to "execute any documents or stipulations necessary to carry out the effect [of the Consent Judgment]." *See* Consent Judgment at 17.

51. The Court will therefore grant Sullivan's motion to approve the survey depicting the boundaries of Parcel 6q.

### 3. The Court's Review of Sewer and Lewis' Conduct with Respect to the Survey of Parcel 6r

52. The Consent Judgment specifically describes the requirements with respect to each specific parcel covered within it. For instance, certain portions of the Consent Judgment require that a parcel be surveyed by a mutually acceptable surveyor; other portions of the Consent Judgment state that the parcel must be surveyed, with the resultant survey subject to the mutual approval of the parties prior to recording; still other portions of the Consent Judgment omit the survey requirement altogether.

53. In light of the Consent Judgment's specific directives regarding survey requirements for each parcel, the omission of the survey language with respect to the discussion of Parcel 6r reveals that the parties did not intend for a survey requirement to apply to Parcel 6r.

54. The Court thus finds that the Consent Judgment does not require the survey of Parcel 6r. Since the Consent Judgment does not call for a survey of Parcel 6r, no mutual approval provision can apply.

55. The Court does note, however, that Parcels 6r and 6q share a boundary. If the survey of Parcel 6r was necessary to accurately determine the boundaries of Parcel 6q, the Court will approve the survey of Parcel 6r for the same reasons discussed above. (*See supra* Section III.D.2.) In that instance, the survey of Parcel 6r would be considered part and parcel to the survey of Parcel 6q. Otherwise, because a survey of Parcel 6r and the approval of such survey are not required under the terms of the Consent Judgment, Sullivan's request for Court approval of the survey of Parcel 6r is moot.

### E. ALLOCATION OF SURVEY COSTS

56. Under the terms of the Consent Judgment, the Defendants taking title to Parcel 6q are responsible for the surveying costs of that parcel in the same proportions in which they take title.

57. Under the terms of the Consent Judgment, no survey of Parcel 6r is required. (*See* discussion *supra* Part III.D.3.) The Court will therefore not compel the Estate of Bernard Williams and Irvin Sewer for the Heirs of Martin Sewer to share in the costs of surveying Parcel 6r.

### F. SANCTIONS

58. While finding that Sewer and Lewis violated the duty of good faith under the Restatement (Second) of Contracts § 205, the Court recognizes that they are acting pro se, and do not have the benefit of an attorney to counsel them regarding their legal duties. Furthermore, while they have steadfastly held on to unreasonable positions that have unduly hindered the implementation of certain terms of the Consent Judgment, the Court does not find that Sewer and Lewis acted with such malicious intent so as to warrant sanctions. That being so, the Court will deny Sullivan's request for sanctions.

### G. SUBDIVIDING PARCEL 6Q AND PARCEL 6R

59. The Consent Judgment does not outline the procedure for subdividing

Parcel 6q and Parcel 6r among the parties.

60. Equity considerations require that the relevant parties provide their input in the process of subdividing the property. The Court will therefore not accept any subdivision of Parcel 6q and Parcel 6r at this time. The parties will be directed to meet and subdivide Parcels 6q and 6r amongst themselves and submit a proposal to the Court for approval.

## IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part the motion for hearing and for imposition of sanctions by the Heirs of Amos Sullivan.

The Court approves the survey of Parcel 6q Newfound Bay, dated November 14, 1996, as to its outer boundaries of Parcel 6q only. Lines drawn for the purpose of subdividing Parcel 6q among the parties are not approved by the Court. A representative of the Heirs of Amos Sullivan, Cedrick Lewis of the Estate of Bernard Williams, and Irvin Sewer for the Heirs of Martin Sewer are directed to meet within thirty days to subdivide Parcel 6q among themselves. Parcel 6q is to be divided among the parties in the following proportions:

(1) To the Heirs of Amos Sullivan: ¾ of an acre of Parcel 6q, ½ interest in the portion called "John George," and a ⅛ interest in the remaining portion of Parcel 6q;

(2) To the Estate of Bernard Williams: ¼ interest in the portion called "John George" and a ⅛ interest in the remaining portion of Parcel 6q; and

(3) To Irvin Sewer for the Heirs of Martin Sewer: ¼ interest in the portion called "John George" and a ⅛ interest in the remaining portion of Parcel 6q.

The parties are to submit a proposed subdivision of Parcel 6q for Court approval no later than July 6, 2001. Failure to do so will require further Court intervention.

The survey of Parcel 6r is approved by the Court only to the extent that this survey was necessary to determine the boundaries of Parcel 6q. Otherwise, the motion to approve the survey of Parcel 6r is dismissed as moot, insofar as the Consent Judgment does not mandate that Parcel 6r be surveyed, and thus approval of such survey is not required. At the time the parties meet to subdivide Parcel 6q, the parties are to also subdivide Parcel 6r among themselves in accordance with the proportions outlined in the Consent Judgment. They are then directed to submit a proposed subdivision of Parcel 6r for Court approval along with their proposed subdivision of Parcel 6q.

Cedrick Lewis for Estate of Bernard Williams and Irvin Sewer for the Heirs of Martin Sewer will be directed to pay their shares in the surveying costs of Parcel 6q as mandated by the Consent Judgment; such shares to be determined at a later date. The cost of surveying Parcel 6r is to be deducted from the $11,000.00 total cost of both surveys. The Heirs of Amos Sullivan are directed to submit information regarding the cost of the survey of Parcel 6q and any supporting documentation to the Court no later than June 22, 2001. Upon receipt of this information, the Court will enter an appropriate order.

Furthermore, the Court denies Sullivan's request for sanctions. Irvin Sewer's Motion to Enforce the Consent Judgment is granted in accordance with the Court's findings. The Court maintains jurisdiction of this case.